EDGAR D. CHAMPION *et al.*

*v.*

HENRY McCARTHY.

*Opinion filed June 19, 1907.*

1. EVIDENCE—*rule as to establishing pedigree by proof of declarations.* In a partition proceeding, where the complainant claims to be a half-brother of the deceased owner of the estate by reason of their both being illegitimate sons born of the same mother before her marriage, the declarations of the alleged mother and of the members of her family, including the husband of her daughter, are competent to prove the relationship claimed by complainant.

2. SAME—*declarations of third parties are not admissible to establish pedigree.* A declaration claimed to have been made to a witness for the complainant in a partition suit by the father of the witness, to the effect that the complainant and the witness were both sons of the declarant but that they had different mothers and that a certain woman was the complainant's mother, is not admissible to sustain the complainant's claim that he was the illegitimate son of such woman.

3. SAME—*rule as to privileged communications between attorney and client.* In order to render a communication between attorney and client privileged, it must relate to some matter about which the client is seeking advice or be made to put the attorney in possession of information supposed to be necessary to enable him to properly advise the client; but the disclosure of mere reasons moving a client to make a deed or will which the attorney is called upon to prepare under the client's directions and about which no legal advice is asked or required is not privileged.

4. SAME—*fact that person has conservator does not necessarily render his declarations incompetent.* The fact that a person has so little mind and capacity to transact business that a conservator is appointed for him to care for his property, does not, of itself, render incompetent the declarations which he has made as to his relationship to another.

5. APPEALS AND ERRORS—*when presence of incompetent evidence will not reverse.* The presence of incompetent evidence in the record of a chancery case will not require a reversal if there is sufficient competent evidence in the record to sustain the decree, particularly where the master's report, which the chancellor approved after overruling exceptions, points out the incompetent evidence and states that it was not considered by the master.

APPEAL from the Circuit Court of Ogle county; the Hon. O. E. HEARD, Judge, presiding.

SEARS & SMITH, and J. C. SEYSTER, for appellants:

The rule permitting hearsay evidence to prove pedigree is limited to cases of legitimate relationship, and such evidence cannot be introduced to establish unlawful relationship *per se* where a lawful relationship is not claimed. *Flora v. Anderson,* 75 Fed. Rep. 217; Abbott on Trial Evidence, (2d ed.) 121; Hughes on Evidence, (1906) 493; Taylor on Evidence, sec. 636; Best on Evidence, 47; 16 Cyc. 1226.

The testimony of the complainant in this case to establish his own heirship was incompetent and improper, and could only have been offered for the purpose of unconsciously influencing the master and court. *Calkins* v. *Calkins,* 220 Ill. 111; *Crane* v. *Stafford,* 217 id. 21; *Laurence* v. *Laurence,* 164 id. 367; Hurd's Stat. 1905, chap. 51, par. 2.

Declarations of deceased members of the family are admissible, on the presumption that, as such members, they knew from general repute the facts of which they speak. *Harland* v. *Eastman,* 107 Ill. 535.

The declarations are not admissible in evidence on questions of pedigree unless the declarants are shown to be dead. *Harland* v. *Eastman,* 107 Ill. 535; 16 Cyc. p. 1231, par. 3; Elliott on Evidence, sec. 380.

In all cases where an heirship is sought to be established affecting the title to real estate the proof must be clear before the law will permit titles to real estate to be affected by the claimants. *Hall* v. *Gabbert,* 213 Ill. 208; *Metheny* v. *Bohn,* 160 id. 263; *Miller* v. *Pennington,* 218 id. 220.

Courts have universally classified as dangerous evidence the testimony of witnesses as to the declarations of men long since deceased, for the reason that it is easily fabricated and perhaps wrongly understood, and in most cases there is no way of contradicting such evidence. 17 Cyc. 806, 808, and cases cited.

Before the declarations of a person alleged to be a parent will be received in evidence the fact of that parentage itself must be admitted or proven, and then declarations of the parent as to the legitimacy or illegitimacy of the child will be admitted. *Haddock* v. *Railroad Co.* 85 Mass. 298.

S. W. CROWELL, and W. J. EMERSON, for appellee:

Facts involved in questions of pedigree may be established by proof of general reputation in the family or by proof of what deceased members of the family have said. *Cuddy* v. *Brown,* 78 id. 415; *Harland* v. *Eastman,* 107 id. 535.

The rule permitting hearsay evidence to prove pedigree extends to illegitimates where the status of the illegitimate under the common law has been changed by statute. *Northrup* v. *Hale,* 76 Me. 306; *Alston* v. *Alston,* 114 Iowa, 29; *Watson* v. *Richardson,* 110 id. 678.

Pedigree may be proved not only by oral and written declarations, but also by acts and conduct, as, for example, concealing a child as illegitimate or in omitting its name from the list of children in the family bible. 1 Elliott on Evidence, sec. 380.

It is enough to show that the declarant was connected with the family without showing him to be a connection of the person whose connection with the family is to be established. Bradner on Evidence, (2d ed.) 427; Abbott on Trial Evidence, (2d ed.) 118; *Blackburn* v. *Crawford,* 3 Wall. 175; *Barnum* v. *Barnum,* 42 Md. 304.

There is a conflict of authorities as to whether the declarations as to a son's illegitimacy by a member of the father's family should be rejected. The better rule is not to exclude such testimony in a proper case. 1 Elliott on Evidence, sec. 376; 2 Wigmore on Evidence, sec. 1492; Hughes on Evidence, (1905) 175.

As to whether a weak-minded person is capable of taking the oath depends upon the mental condition in each case.

A man may be in one sense *non compos mentis* and yet be aware of the nature and sanction of an oath. 3 Wigmore on Evidence, sec. 1822; 22 Cyc. 1110, note; *Tucker* v. *Shaw,* 158 Ill. 326; *Hovey* v. *Chase,* 52 Me. 304.

An illegitimate may inherit from an illegitimate through his mother. *Miller* v. *Williams,* 66 Ill. 91; *Bales* v. *Elder,* 118 id. 436; *Jenkins* v. *Drane,* 121 id. 217.

A bastard may by statute be a member of his mother's family. *Miller* v. *Williams,* 66 Ill. 91; *Northrup* v. *Hale,* 76 Me. 306; *Hall* v. *Gabbert,* 213 Ill. 208; *Bales* v. *Elder,* 118 id. 436; *Trust Co.* v. *Railroad Co.* 91 Ill. App. 333.

Mr. JUSTICE FARMER delivered the opinion of the court:

This suit was begun by appellee, Henry McCarthy, filing a bill for the partition of certain lands of John Earl, deceased. The bill alleged that Earl was the owner of certain lands therein described; that he died November 13, 1905, leaving no children nor descendants of a child or children, no widow and no father nor mother surviving him; that he left surviving him Lydia Cheshire, a sister; Edgar D. Champion, Flora E. Collins, Lillian McAlpine and Grace A. Champion, nephews and nieces, the only surviving children of Daniel Champion, a deceased brother; also Eliza Reed and Francis Kline, the only surviving children of a deceased sister, and the complainant, as his sole and only heirs-at-law. The bill alleges that John Earl and Lydia Cheshire, and the deceased brother and the deceased sister of John Earl, and the complainant, were all sons and daughters of Susan Champion, who died March 3, 1893, leaving no other heirs than her sons and daughter and the children of a deceased son and daughter. Complainant claimed in his bill that by the death of John Earl he became seized of an undivided one-fourth of his lands, Lydia Cheshire of an undivided one-fourth, the children of the deceased brother one-fourth and the children of the deceased sister one-fourth, and prayed for partition. The children of the deceased

brother and sister of John Earl answered the bill, denying that complainant was the son of Susan Champion and a brother of John Earl and denying that he had any interest in the lands described in the bill. They also filed a cross-bill asking for partition of the lands among the heirs of John Earl, in which they alleged that complainant in the original bill was not an heir of John Earl and asked that he be denied any right or interest in the lands. After answer filed to the cross-bill, replications to said answer and to the answer to the original bill, the cause was referred to the master in chancery to take the testimony and report his conclusions. After hearing the testimony the master reported that he found all of the material allegations of the original bill true; that John Earl, at the time of his death, left surviving him as his only heirs-at-law the persons named as such in the original bill, and that they inherited the lands of said John Earl, deceased, in the proportions therein alleged. Appellants filed objections to the report before the master, which were overruled by him. They also filed exceptions to the report in the circuit court. These exceptions were overruled by the chancellor and a decree entered for partition in accordance with the master's report and the prayer of the original bill. To reverse that decree this appeal is prosecuted.

The controversy is as to whether the complainant, Henry McCarthy, is an heir of John Earl, deceased, and entitled to an interest in the lands of which he died seized. Complainant claimed to be an illegitimate son of Susan Champion, who was the mother of John Earl. It is admitted that Earl was an illegitimate son of said Susan Champion, whose maiden name was Ayres. She originally lived in Elizabeth township, near Brockville, Ontario, Canada. There she was married to Elias Champion in 1830. John Earl was born to Susan Champion (then Susan Ayres) in 1822, and after her marriage to Elias Champion he became a member of his mother's family and lived with her up to the time of

her death, in 1893, usually being known by the name of John Champion. In 1849 Elias and Susan Champion and several children born to them after their marriage, and John Earl, moved to DuPage county, Illinois, where they resided about one year and then moved to Ogle county, where they lived until the parents died. Susan Champion died in 1893, leaving a will, in and by which she devised to John Earl the real estate in controversy. Complainant claimed to be an illegitimate son of said Susan Champion, born to her in Canada in 1826, before her marriage to Elias Champion. This would make him a half brother to John Earl, and, as such, an heir entitled to a one-fourth interest in the real estate of which John Earl died seized. Henry McCarthy, the complainant, never lived in the family of Susan Champion after her marriage. Lydia Cheshire, the oldest daughter of Susan and Elias Champion, testified that she saw Henry McCarthy in Canada before her parents moved to Illinois; that he, with his father, came to her parents' house once. She says this was in the neighborhood of two years before they moved from Canada to Illinois. In 1853 the Champions conveyed to John Earl two tracts of land in Ogle county, Illinois, and at the same time they conveyed to Henry McCarthy two other tracts in said county, apparently, from the description, containing an equal amount to that conveyed to Earl. Mrs. Cheshire testified that Mc-Carthy was at the house of her father and mother at the time that transaction occurred. In November, 1854, Henry McCarthy conveyed his land to Daniel Champion, a son of Elias and Susan Champion, and he was at the Champion home at the time this transaction occurred. He appears to have located in Iowa about 1856.

Lydia Cheshire was offered as a witness by complainant. She was seventy-five years old at the time of the trial, and, as before stated, was the oldest child of Elias and Susan Champion. Her testimony was not altogether consistent, but shows that the subject of Henry McCarthy's relation-

ship to the family had been a matter of some talk, for she testified that more than once she asked her mother if he was any relation of theirs, and her mother would tell her to go off and play. As to whether her mother ever told her that Henry McCarthy was her brother, her testimony is not very harmonious. At one time she would say her mother did not so tell her and at other times she would say she did, and that she, the witness, repeated this to others. This was probably due to the infirmities of age and the embarrassment of the witness' position. She testified she and her mother made and gave to Henry McCarthy a fancy shirt, and at her mother's direction witness sent him one of her mother's pictures. It appears from this witness' testimony that at one time Henry McCarthy sent Susan Champion a dress, and the witness testified that on that occasion she heard her mother say Henry McCarthy was her son, and she had also heard her say the same thing when Henry McCarthy would be at her house. She further testified that when Henry McCarthy came to their house, which she says he did several times, it would cause talk as to who he was, but that he was never recognized by the family as a member of it. She says when her mother died Henry McCarthy was notified of it by telegram, and when asked why this was done, said she thought he was in the family and would want to see his mother. She also testified she had heard John Earl say McCarthy was his brother.

Joseph Sheaff, a witness for complainant, testified to a conversation with John Earl. At the time this conversation occurred it appears that Daniel Champion, son of Elias and Susan Champion, was then living, and the conversation related to him. The witness testified Earl said, "I have another brother." The only other son ever born to Elias and Susan Champion was a child named Eli, who died in infancy, before his parents moved from Canada, and the witness said he understood Earl was speaking of a living brother.

Samuel M. Wills testified, on behalf of complainant, that in the fall of 1893, after the death of Susan Champion, John Earl told him McCarthy was his brother; that he was born in Canada; that they came out here together and that McCarthy went to Iowa, and that Earl said when he died McCarthy was to have his money.

William Knott testified, for complainant, that John Earl boarded at his house after his mother's death, and that while boarding at his house Earl told witness he had a brother by the name of Dan Champion, who lived out west, a sister named Lydia Cheshire, and a brother in Iowa by the name of Henry McCarthy; that his mother had told him Henry McCarthy was his brother, and he wanted him to have his property.

Eliza Vance testified that John Cheshire, the husband of Lydia Cheshire, told her (the witness) shortly after the death of his mother-in-law, Susan Champion, that Henry McCarthy was his wife's brother. John Cheshire died before this suit was instituted.

Delos W. Baxter testified he was a practicing lawyer and had practiced about twenty-five years. He had held the offices of State's attorney and State Senator. He had known Susan Champion from his boyhood, and also the members of her family, including John Earl. He had been employed by Susan Champion in a lawsuit in the early part of his professional career. He testified that in 1886 Susan Champion came to his office with William Stocking, who was the conservator of John Earl, to get him to draw her will; that in transacting the business she talked of her family, and said Henry McCarthy, John Earl, Lydia Cheshire and Daniel Champion were her children, and also mentioned a child or children of a deceased daughter. Some time after this talk the witness drew the will and went with Mr. Stocking to the home of Mrs. Champion to have it executed. On this occasion the witness said Mrs. Champion again told him Henry McCarthy was her son but that it was not gener-

ally known in the neighborhood, and for that reason she did not want his name mentioned in the will. She also said that McCarthy, Mrs. Cheshire and Daniel Champion were all well provided for, and that as John was not bright he needed what she had. The witness further testified that after the death of Mrs. Champion John Cheshire and Daniel Champion (who died before this suit was begun) told him that Henry McCarthy was a half brother of John Earl and would share in the distribution of his estate. The proof also shows some degree of intimacy between Henry McCarthy and Susan Champion and her family. He was a visitor at the home of Susan Champion a number of times while she was living, and at the home of Lydia Cheshire after the death of Susan Champion.

This is the substance, we believe, of the most material testimony relied upon by complainant, Henry McCarthy, which in our opinion was competent. Appellants insist that this testimony was incompetent. It is not denied that hearsay evidence, such as declarations of deceased parents and members of the family, may be proven to establish pedigree, but it is contended that the rule permitting such proof is limited to cases of legitimate relationship and cannot be heard to establish illegitimacy. While this position is apparently sustained in *Flora* v. *Anderson,* 75 Fed. Rep. 217, cited and relied on by appellants, that case is not in harmony with the great weight of authority as well as the better reason. That case followed the English case of *Crispin* v. *Doglioni,* 3 Swab. & Tr. 44, which appears to have been based upon the common law rule that an illegitimate is *filius nullius.* This common law rule has been abrogated in this and other States by statute, (*Miller* v. *Pennington,* 218 Ill. 220; *Bales* v. *Elder,* 118 id. 436;) and where such statutes have been enacted, *Crispin* v. *Doglioni* cannot be regarded as authority to be followed. The declarations sought to be proved in that case were those of a deceased brother of the intestate putative father, and the court held that the puta-

tive father had no relationship with a bastard son, and his declarations, or those of members of his family, were therefore incompetent.

As to whether declarations of the supposed father and members of his family are competent there is some conflict in the authorities. In Elliott on Evidence (vol. 1, sec. 376,) it is said: "There is a conflict as to whether the declarations as to a son's illegitimacy, by a member of the father's family, should be rejected. The better rule is, not to exclude such testimony in a proper case. There seems to be no dissent whatever, however, as to the admission of the declarations, in a proper case, as to illegitimacy, made by a member of the mother's family. There is, perhaps, a technical reason for excluding the declarations as to illegitimacy where they show that the person is a bastard, and not, therefore, a member of the father's family; but this would hardly apply in case of the mother, and in most of the States there are statutes which change the common law status of bastards."

In Wigmore on Evidence (vol. 2, sec. 1492,) the author says it has been held in England that where the relationship sought to be established is that of an illegitimate child, the declarations of the father's relations are not competent, citing *Crispin* v. *Doglioni*. The author adds: "The principle of the ruling has been disapproved in England and ought not to be followed in this country. It seems never to have been doubted that the declarations of the parents themselves, or the repute in the household where the child lived, as to a child's legitimacy or illegitimacy, are receivable, although it is obvious, upon the false theory of *Crispin* v. *Doglioni*, the father's declarations of illegitimacy would be inadmissible."

The case of *Crispin* v. *Doglioni* was approved in *Northrop* v. *Hale*, 76 Me. 306, (49 Am. Rep. 615,) the approval being upon the ground that the ruling was correct where the bastard occupied the position the common law placed

him in.   In the *Northrop case* the claimant to an estate sought to establish that he was the illegitimate son of the intestate by the declarations of a deceased sister of the intestate.   The court, after citing and reviewing authorities, English and American, say:   "It would seem, therefore, that the declarations of the intestate would be admissible to show that the appellant was her illegitimate son;  and if the mother's declarations would be, why would not be those of the mother's sister, in whose family the child was born and brought up and in which the mother lived at the time and for years after?"

The rule that declarations of the supposed parent and deceased members of his or her family may be proven to establish the parentage where the relationship is illegitimate, is supported in *Crawford* v. *Blackburn,* 17 Md. 49, (77 Am. Dec. 323,) *Blackburn* v. *Crawford,* 3 Wall. 175, *Watson* v. *Richardson,* 110 Iowa, 678, and *Alston* v. *Alston,* 114 id. 29. In all of these cases it is held that the declarations of the putative father may be proven.   Unquestionably, by the great weight of authority the declarations of the mother and the members of her family are competent to prove the relation of parent and child without regard to whether the claim is that the child was legitimate or illegitimate.   It is, of course, to be understood that this rule is applicable only in cases where the child was born before marriage of the mother or in cases where she had never been married.   Besides the declarations of Susan Champion, the complainant proved the declarations of John Earl and Daniel Champion that Henry McCarthy was their brother, and of John Cheshire, husband of Lydia Cheshire, oldest daughter of Susan Champion, that said Henry McCarthy was the brother of his wife and John Earl.   We think these declarations of these parties were competent.   John Cheshire's relationship to the family, as husband of Susan Champion's daughter, was sufficient to render his declarations admissible.   *Greenwood* v. *Spiller,* 2 Scam. 502;  Bradner on Evidence, p. 427.

228—7

It is also insisted that the statements Baxter testified Susan Champion made to him in connection with the preparation and execution of her will were privileged communications, and that he should not have been permitted, over the objections of counsel for the grandchildren of Susan Champion, to testify to them. It does not appear from his testimony that the information given by Susan Champion as to who her children were was necessary to be communicated to Baxter to enable him to prepare the will in accordance with her desires. According to his testimony she knew how she wanted to dispose of her property and how she wanted her will made. Her statements appear to have been more in the nature of an explanation of her reasons for giving practically the whole of her estate to one of her children. The fact, also, that the communication was made in the presence of another party would seem to indicate that it was not intended as a confidential communication to her attorney. In order to render a communication between attorney and client privileged, it must relate to some matter about which the client is seeking advice, or be made in order to put the attorney in possession of information supposed to be necessary to enable him to properly and intelligently serve his client. Where the transaction between the attorney and client is the preparation of a deed or a contract in accordance with the directions of a client, and no legal advice is asked or required, the reasons or motives moving the client to make the deed or contract, if stated to the attorney, are not privileged. (*DeWolf* v. *Strader,* 26 Ill. 225; *Smith* v. *Long,* 106 id. 485; *Hatton* v. *Robinson,* 14 Pick. 416.) In Wigmore on Evidence (vol. 4, sec. 2314,) will be found a discussion of the subject of privileged communications relating to the preparation of wills, and the author there announces the rule to be, that the fact of the execution of a will, and its contents, are within the rule during the life of the testator, but the rule ceases at his death, and the attorney may then disclose all that affects

the execution and tenor of the will. The only exception to this rule, it is said, is the disclosure of facts that would tend to invalidate the will. A large number of cases are cited in the notes to the text in support of the rule announced. In *Blackburn* v. *Crawford, supra,* the father of the alleged illegitimate children procured an attorney to prepare a will for him. He wished to secure certain property to his children by a woman named Elizabeth Taylor, to whom he claimed he was never married. The attorney advised him that he could secure the property to the children by a deed, or by will, or by marrying their mother. The latter, he declared, he would not do, and instructed the attorney to prepare a will and describe the children therein as his natural children by Elizabeth Taylor. The Crawfords sought to prove a marriage between their father and mother, and the parties resisting their claim to the estate offered to prove by the lawyer who drew Crawford's will what he said at the time. The trial court refused to admit this testimony. The Supreme Court of the United States held that this was error and said the testimony should have been admitted. We think the testimony of Mr. Baxter was competent.

The proof shows that John Earl was weak-minded. This weakness was of such character that when he became the owner of property a conservator was appointed to manage it for him, and it is contended that on account of his lack of mental capacity his declarations should not have been received in evidence. We do not think such a degree of imbecility was shown as would justify the exclusion of the testimony as to his declarations. While he had but little capacity to transact business or manage and control property, he had sufficient intelligence to take care of himself and to know and remember his friends, relatives and acquaintances.

Among the objections filed to the report of the master it was objected that the master improperly considered the

testimony of Henry McCarthy, the complainant, touching his relationship to Susan Champion and John Earl; also the testimony of Daniel McCarthy, who claimed to be a half brother of Henry; and that the master improperly considered the testimony of certain witnesses as to declarations made by Lydia Cheshire that Henry McCarthy was the son of Susan Champion. The master reported that after considering the objections he adhered to the report, but that in arriving at his conclusions set forth in said report he had not considered the testimony of Henry McCarthy, Daniel McCarthy, nor the testimony as to statements or declarations of persons living at the time the testimony was offered, for the reason that he considered such evidence incompetent. It is conceded by counsel for appellee that the testimony of Henry McCarthy was incompetent, except such portions of it as related to conversations occurring after the death of John Earl. Lydia Cheshire was the witness whose statements as to Henry McCarthy's being the son of Susan Champion were testified to by certain witnesses. She was living and testified in the case, and the testimony of other witnesses as to her declarations the master correctly held to be incompetent.

Counsel for Henry McCarthy insist that the testimony of Daniel McCarthy was competent and should have been considered by the master. He testified that he and Henry McCarthy were sons of the same father but not of the same mother, and that he had heard his father say that Susan Champion was Henry McCarthy's mother. Daniel said he was fourteen or fifteen years old when he heard this declaration made, and it is apparent this was several years after Susan Champion had been married to Elias Champion. It does not clearly appear from the abstract that Daniel McCarthy's father was dead at the time he testified, but if he was, we think his declarations were incompetent. Such declarations to establish pedigree must be of members of the family, and not of third persons. Daniel McCarthy's father

and Susan Champion were in no way related, were never members of the same family, and while his declarations, if dead, might be competent to prove that he was the father of Henry, if that were the question at issue, they were not competent to prove that Susan Champion was the mother.

Appellants offered a number of witnesses who were well acquainted with Susan Champion during her lifetime, some of whom had been on very intimate terms with her, and they all testified they had never heard her mention Henry McCarthy as being her son or relative. They also offered in evidence several letters written by Henry McCarthy to Lydia Cheshire between April 7, 1898, and January, 1905. What these letters contained is not shown by appellants' abstract, except they were addressed to Lydia Cheshire as "Dear Friend" and "Dearest Friend," and signed by Henry McCarthy.

Leaving out of consideration the incompetent testimony offered on behalf of Henry McCarthy, which the master says he did not consider in arriving at his conclusions, we are not prepared to say that the competent testimony, considered in connection with the testimony offered by appellants, is not sufficient to sustain the decree. The decree recites that the chancellor's findings are based upon the report of the master and the evidence taken before him and contained in his report. In the absence of any showing to the contrary, the presumption is that the master and the chancellor acted only upon competent testimony, and where there is some incompetent testimony in the record, if it contains sufficient competent testimony the error in admitting incompetent testimony will be regarded as harmless. (*Allison* v. *Perry*, 130 Ill. 9; *Dunn* v. *Berkshire*, 175 id. 243; *Church of Christ* v. *Christian Church*, 193 id. 144; *Merchants' Despatch Co.* v. *Joesting*, 89 id. 152.) Here we are not left to the presumption that the master considered only the competent testimony, for in his report he expressly states that he did not consider the incompetent evidence, and

the decree approves that report and the conclusions from the evidence upon which it was based. While the evidence offered by complainant may not be of the most conclusive character, it is in the line of the only testimony ordinarily obtainable in cases of this character. With the exceptions mentioned, the testimony offered by complainant was competent and tended to prove that Susan Champion was his mother. The master found it sufficient to establish that fact. The chancellor approved that finding and entered a decree accordingly. In such cases the decree will not be disturbed by this court unless clearly and manifestly against the weight of the evidence. *Siegel* v. *Andrews & Co.* 181 Ill. 350; *Williams* v. *Lindblom,* 163 id. 346; *Treloar* v. *Hamilton,* 225 id. 102.

The decree of the circuit court is affirmed.

*Decree affirmed.*