In re Estate of William H. Healea, Deceased, Nellie D. Verne, Appellant, v. John Healea et al., Appellees.

**Gen. No. 8,276.**

336

Opinion filed April 17, 1929. Rehearing denied May 31, 1929.

CHARLES A. ZWENG, ADLAI H. RUST and HALL, MARTIN, HOOSE & DEPEW, for appellant; EDWARD BARRY, JR., of counsel.

CHAS. M. PEIRCE, for appellee.

MR. JUSTICE SHURTLEFF delivered the opinion of the court.

This is an appeal by Nellie D. Verne, appellant, from an order of the circuit court of McLean county, Illinois, finding that John Healea and others, brother, nephews and nieces of William H. Healea, deceased, appellees, are heirs at law of the said William H. Healea, and that Nellie D. Verne, appellant, is not William H. Healea's daughter.

The case was tried in the circuit court on appeal from the probate court. The probate court had originally granted letters of administration to Nellie D. Verne upon the estate of the said William H. Healea, deceased, and entered an order finding that Nellie D. Verne was his only heir at law. John Healea, a brother, and Obe S. Healea, a nephew of the deceased, filed a petition asking the court to set aside the orders appointing Nellie D. Verne as administratrix and finding her to be the heir at law. The probate court, after a hearing upon that petition, granted the prayer thereof and set aside its previous orders and the respondent in that petition, appellant here, appealed to the circuit court of McLean county, Illinois.

The testimony of a great many witnesses was heard in the circuit court and some documentary evidence was introduced. There were no propositions of law submitted to or found by the trial court and at the

conclusion of the trial the court affirmed the decree of heirship found and entered in the probate court and the order of that court removing appellant, Nellie D. Verne, from the office of administratrix, from which orders she has appealed.

The facts in this case as presented by the proofs are somewhat more involved in obscurity than in some of the cases passed upon by the courts, but nevertheless must be passed upon in this case.

The evidence shows without controversy that Mary Catherine Livingston taught school at the Healea schoolhouse near Empire, Illinois, during the fall and winter of 1875 and 1876; that William H. Healea, the deceased, who was then about 13 or 14 years old, was one of her pupils at that time; that Mary Livingston, while she taught there in 1875, stayed at the home of Ed. Healea, the father of William H. Healea and that the latter was at home at that time. This was the beginning of the acquaintanceship between William Healea and Mary Livingstno who were married in 1889, and we find that Mary Livingston again taught the Healea school in 1887 and 1888, when she also stayed at the Ed. Healea home. Mary Livingston was the daughter of Durham Livingston, was born in 1852 and became a school-teacher at the age of 14. She had two sisters, Sarah, also called Sadie, who married William Williams, and Julia, who married Taylor Goddard, and one brother, Johnny Livingston. Mary Livingston married William H. Healea in 1889 at Peoria, Illinois, and later she and her husband moved to Bloomington. She died in 1916 and her husband died in 1927. Sarah Williams also died several years ago. The evidence is also undisputed that Nellie, the appellant, when about 4 weeks old, on May 12, 1884, was left on the doorstep of the home of Sarah and William Williams, who proceeded to adopt her at the May term, 1884, of the county court of McLean county and that

appellant lived with the Williams family until she was approximately 16 years of age.

The fact that Mary Livingston was the mother of appellant was shown by the following: Charles Razor testified that he first saw Nellie when she was 4 or 5 years old with Mary Livingston Healea, who was showing the child the store windows on the west side of the courthouse in Bloomington; that Mary Livingston, after her marriage to William H. Healea, told witness frequently that appellant was her child and always spoke of Nellie as her daughter; that William Healea told him in 1917 or 1918 that Mary Livingston (when she returned to Bloomington in 1884) got off the train, heavily veiled, and had a hack driver drive her to the Williams home to leave the baby, but that it did not suit her to leave appellant that night and so they went to the St. Joseph's Hospital in Bloomington and stayed and then the next night she left Nellie in a basket on the Williams porch. The witness also talked with Mary Healea at different times about the parentage of appellant in the presence of her husband.

Charles Razor also testified that Johnny Livingston, the brother of Mary Livingston Healea, told him once in 1914 that he had to spend $500 for his sister Mary to go to have an operation for a kid; that the witness then said to Johnny, "Now you have told me all this, is she Mary and Will's child?" and he said, "It is absolutely their child, nobody else's."

Dr. John W. Fulwiler testified that he was the attending physician for Mrs. Mary Healea at the time of her death in 1916; that she died of cancer of the uterus; that witness first saw appellant in 1906 or 1907 in the poormaster's office in the courthouse with her mother, Mrs. Healea; that Mrs. Healea always spoke of Nellie as her daughter.

Grace Deane testified that she worked at Sarah Williams' dressmaking shop as a dressmaker for 2 or 3

years about 20 years ago; that Mrs. Williams was a half sister of Mary Healea and witness asked Sarah, while working there, why she was interested in appellant, and she said because Nellie was her half sister's daughter and also said in response to a question that Nellie's mother paid for her clothes. She also said that Nellie was left on her doorstep and that she did not fully know whose child she was until Nellie was 12 years old and left home. Mrs. Williams also told witness that the morning after Nellie was left there that Mary Healea came to her house and picked the baby up and kissed it and loved it, that a letter was left in the basket with the baby telling how it should be educated and that money would be furnished the Williams in gold. She also said Nellie was born at St. Joseph's hospital in Bloomington.

Phil A. Karr testified that while he was superintendent of the county farm, Mrs. Healea filled out the unexpired term of her father as poormaster; that she sent a young woman who was expecting confinement out to the farm and came out to look after her; that on the way back to town Mary Healea said she had sympathy and felt sorry for unfortunate girls because she had had a like experience of her own.

Mrs. Anna Baldwin testified that she was intimately acquainted with Sarah Williams who died in 1922; that the latter stayed at the home of the witness in 1909 and 1910 and during that time told the witness more than once that Mary Healea came and confessed to her that she was appellant's mother.

Mrs. Mayme Ulbrich testified that before her marriage she was a dressmaker and worked for Sarah Williams in 1903; that the latter wanted to adopt witness and told witness about adopting appellant, and that appellant was left on her doorstep when a baby with a note telling her name and that money would be left to help support her, and she said money was left through

the window at different times. She said Mary Healea came to her house and acted surprised to see the baby and tears rolled down her cheeks and she picked it up and said if Sarah would keep it she would help take care of it. Mrs. Williams told witness later that she knew Mary Healea was the mother of appellant.

Ethel Manning testified that in 1903, at her home, the mother of witness told Mary Healea, in the presence of witness, that appellant "looks enough like you to be your daughter," and that Mrs. Healea said appellant was her daughter.

Dr. E. C. Williams testified that Sarah Williams was his mother's cousin and sister-in-law; that during Sarah's last sickness the witness asked her why she did not have appellant come and take care of her and she said she did not want to because Nellie had left her when she needed her. Sarah Williams said she wanted to make a will and that she would not remember appellant and that the latter had no claims on her; that Mary Healea was appellant's mother and was in a position to take care of appellant. Sarah also told witness that Nellie had been offended at her ever since she found out who her mother was; that appellant found it out at school and was upset because Sarah had not told her, and that appellant's attitude had changed toward Sarah Williams after she discovered Mary Healea was her mother. Sarah also told witness that Nellie was born over east some place.

Mrs. Margaret Razor testified that she met Mary Healea 2 or 3 years before her death in 1916 and told her she had heard that she was appellant's mother and said, "Now, Mary, is it true that you are? I am just asking you this because I want you to defend yourself," and Mrs. Healea said, "Yes, it is true, she is my child." Witness also told Sarah Williams she would like to know who Nellie's mother was and Sarah said, "Hasn't Aunt Caroline told you?" and witness said,

"Yes, but I wanted to know your opinion of it and who you thought she was." Sarah then said, "Why, it is Mary Healea's and Mary made a full confession to me and cried about it." Mrs. Sarah Williams also said she could never feel right toward Mary for putting the burden on her to raise the child.

Copies of pictures were made of Mary Livingston Healea taken at the time of her marriage and presented to the witness Mary Eaton, whose deposition was taken at Brownsburg, Indiana, and Mrs. Eaton testified that she has been living in Brownsburg since 1878, and that in the spring of 1884 a woman shown in the photograph was there under the name of Madge Arndt and lived next door to the witness with a Mr. and Mrs. Evans who are both dead; that witness saw Mary Livingston there at the Evans home and at church and on the street in Brownsburg; that Mrs. Evans told witness her name was Madge Arndt and witness heard Mrs. Evans call her by that name; that there never was any family in or around Brownsburg, Indiana, by that name; that the woman—Mary Livingston or Madge Arndt—wore a dolman, a long wrap with sleeves and loose in front; that witness never saw a baby there but that Mrs. Evans was the kind of a woman who would conceal the fact.

Mrs. Eaton also attended a turkey dinner at the home of the Evans where Mary Livingston was staying in 1884, and saw her there at that time. In 1884 Mrs. Evans made a hair wreath for the witness, which she still has, and it was at that time she saw Mary Livingston or Madge Arndt at the home of Mrs. Evans. Witness also saw this woman sitting upstairs sewing at the front window in the Evans home, and she fixes the date by the hair wreath, as she had a record in a book of the time it was made, which book she burned with some rubbish after reading it two years ago. To connect up this testimony and render it further ma-

terial, appellant proved that Mary Livingston or Madge Arndt gave birth to a child at Brownsburg on April 15, 1884. This was shown by the testimony of Sherrill May, who testified that he is the town clerk of the town of Brownsburg, Indiana, and has in his possession a book containing the records of vital statistics of said town for the year 1884; that the book contains an entry showing the birth of a white, female child to a woman who gave the name of Madge Arndt, on April 15, 1884; that the record shows that this child was born in Brownsburg on that date and was the first child of the mother; that the father's name was C. C. Arndt and his nationality German; that the mother was American, born in Illinois, and her maiden name was given as Madge Lyons and her residence given as Brownsburg, that the medical attendant was Dr. John S. Marsh and that the child was not illegitimate. The witness also testified that the book in which this record is contained was turned over to him by his predecessor in the office of town clerk and that witness is the custodian of the clerk's records, among which is the book testified about. The fact that this record was in proper custody is shown by the copy of sections 8, 9 and 10 of the laws of Indiana, approved March 7, 1881, certified under the hand of the secretary of state of Indiana and under the seal of said State.

The proofs submitted tending to show that William H. Healea was the father of appellant were about as follows:

Charles Razor testified that he saw appellant in the Healea home frequently, almost every time he was there; that after Healea's wife died, witness asked him why he did not have appellant keep house for him and he said the reason he did not was the way the child came into the world; he thought it best for her to go away so it wouldn't make her so embarrassed and then he couldn't stay at home and that she could make

something and help with the expenses; that witness asked Healea if Nellie was his daughter and he said "Yes"; that this was in 1916; about two years after Mary Healea died, and he was sighing and moaning about his folks never coming to see him; that once when Healea was sick he told witness if he got any worse to call Nellie; that witness knew Healea since the latter was a boy and they both took music lessons at the same place as early as 1873 or earlier. Witness also testified that when Mary Livingston was teaching at the Healea school and staying at Ed. Healea's home there was no one there but Will Healea's mother and father and Will Healea and Mary Livingston; that Will Healea roomed at the home of the witness the third year after Mary Healea died and one night they were all sitting around the table and Healea was writing something and witness asked if he was writing a will and he said "Yes." He said he did not want John to have anything but wanted Obe to have $1,000 and his nieces and nephews $500 apiece; that witness asked him a question and he got up and tore the paper up and said he couldn't make a will and didn't want John to have anything, and he threw the paper in the wastebasket and said Nellie was entitled to it, all of it.

Charles Razor also testified that he had a conversation in 1914 with Johnny Livingston, the brother of Mary Livingston Healea, in which conversation the latter told the witness that he had had to spend $500 for his sister Mary Healea to go to have an operation for a kid; that the witness then said to Johnny, "Now you have told me all this, is she (appellant) Mary and Will's child?" and Johnny said, "It is absolutely their child, nobody else's."

William Ernest testified he had known William Healea for 35 years, lived the second door from him and saw him every day; that he saw appellant at the Healea home often; that Healea put a fence around

witness's place and a roof on his house in 1909 or 1910, and that they worked on it together; that at that time witness asked him what had become of appellant and he said that she was at some of their relatives; that witness then asked him who appellant was and he said that she was their daughter—Healea said that Nellie was his daughter.

Mrs. Margaret Razor testified that when Mrs. Sarah Williams, sister of Mary Healea, told her that Mary Healea was appellant's mother, the witness said, "Now, Mrs. Williams, you have told me who the mother was, I want to know, if you will tell me, who the father was?" and that Mrs. Williams said, "Will Healea is"; that a day or two later the witness told Will Healea that she had been to see Mrs. Williams and had heard a whole lot and he said, "I was expecting to hear from her"; that witness then told him what Mrs. Williams had said about him being appellant's father and Mr. Healea said, "Well, I am."

Dr. J. Witfield Smith testified that on March 1, 1922, William Healea brought a lady, who gave her name as Nellie Williams, to his office and witness fitted her with a pair of glasses and that Mr. Healea paid the bill; that this is shown by his books.

Dr. John W. Fulwiler testified that William Healea brought appellant to his office and said, "You remember Nellie, she lived at our house a long time," and witness said he remembered her; that Healea then said, "My daughter has been to Chicago for some little time and has been down visiting and she wants to talk a little about how she feels"; that witness prescribed for appellant and Healea paid the bill. Witness also testified that after Healea's wife died in 1916 witness met Will Healea and appellant at the Commercial Hotel, where they ate; that at that time Healea introduced appellant, saying: "My daughter, you remember her." Witness also testified he saw appellant at the Healea home 35 or 40 times.

Appellant offered to prove by Mrs. Anna Baldwin that Mrs. Sarah Williams, deceased, sister of appellant's mother, told the witness shortly after Mrs. Healea's death that Will Healea came to her and told her that he promised his wife just before her death that he would always take care of their child, the appellant.

Henry Larson testified that he was a very close friend of William and Mary Healea and knew the latter ever since he was old enough to remember anything; that he lived next door to them and saw appellant at their home both before and after Mrs. Healea died; that at the time of her death the home was made up of Mr. and Mrs. Healea and appellant; that Mrs. Healea always called appellant Nellie Healea.

Walter G. Miller testified that Mr. Healea came in the jewelry store operated by witness and his father, Charles L. Miller, and said: "I come in to purchase a watch for the girl, she lost her watch or it was stolen"; that the watch was mailed to Chicago.

Oscar Olson testified he knew Healea for 25 years; that he saw appellant at the Healea home many times in 1912, when he visited there often; that Will Healea used to say "off and on" after his wife died that he had sent some money to Chicago to "the girl"; that witness had seen Healea and appellant go by his house together after Mrs. Healea died and has seen appellant at the Healea home seven or eight times since Mrs. Healea's death; that appellant was living in 1912 part of the time at Healea's and part of the time in Chicago.

F. L. Warner testified that Will Healea spoke to him a number of times about appellant; that he would say, "I got a letter from my daughter" or "got a letter from my girl"; that Healea told witness a number of times he had a letter from his daughter. James W. Cundiff testified that he had a conversation with William H. Healea in which the latter referred to "his daughter or the girl," as being a musician and playing in an orchestra away from home most of the time.

Charles L. Miller testified he knew Healea for 25 years; that witness sold him a watch and his son sold him a second watch; that at the time of both purchases Mr. Healea said he was buying it "for the girl" in Chicago.

Oscar Anderson testified he lived six doors east of William Healea and has known the latter and his wife, Mary Livingston Healea, all his life; that he never knew appellant to be anything but Nellie Healea that he saw appellant throughout his school days at the Healea home for a period of 13 years and has seen her with her mother, Mrs. Healea.

Mrs. Elmore Wolff testified that she knew William and Mary Healea for 35 years and lived right across the street from them part of the time and about 6 or 7 houses east of the Healea home part of the time; that she knows appellant only as Nellie Healea and first became acquainted with her when appellant was about 12 years old; that appellant was about 16 years old when she came to live with the Healeas; that witness has seen appellant going into and coming out of the Healea home frequently, and going out in the morning and coming back in the afternoon, and with Mr. and Mrs. Healea. Ethel Manning testified that one afternoon she went to the Healea home to get appellant to go skating, and appellant told Mr. Healea she wanted some money and he opened a pocketbook and gave her some change; that witness has seen appellant and Mr. Healea together 6 or 8 times in 1902 and 1903 when she called at Healea's home.

There are a number of other facts and circumstances which, taken together and examined in the light of the testimony in this case, strengthen and corroborate appellant's evidence to a considerable degree and bear out her contention that she is the child of William and Mary Healea. They treated Nellie as their child. She was seen going to and coming from the Healea home

frequently after she went there to live; and several of the neighbors knew her as Nellie Healea and saw her frequently with her parents. Mr. Healea bought watches for her and they paid for her clothes. He took her to the doctor when she was sick, and paid for prescriptions and glasses for her. He gave her money even after she had become a musician and was playing at Chicago. They furnished her with a musical education at the Wesleyan College of Music, which was natural in view of the fact that her mother, Mary Healea, was a music teacher and schoolteacher.

Photographs from the family album have been certified to this court of Mary Livingston Healea and William H. Healea and various original checks for money given by William H. Healea to appellant after the death of Mary Livingston Healea for moderate sums at different times, bearing the indorsement of appellant, are before this court.

Numerous witnesses testified in behalf of appellees, some of the testimony being of a negative character and in some instances it was of a positive nature.

Joseph Rutledge testified that he never saw Healea and his wife with a child, but that he never lived in Bloomington and saw William H. Healea probably only two dozen times in the last 25 years. Mrs. Lila Hammond says she never saw Will Healea and Mary Livingston together after 1900. Mrs. Ora Vance said she attended a Christmas dinner at Will Healea's house in 1897 or 1898 and was there only the once and there was no child there. That would be when appellant was about 13 years old and was at Sarah Williams.' Roy Thompson testified that Mary and Will Healea visited the Ed. Healea homestead only 3 or 4 times a year from 1891 to 1907 when Ed Healea died, and that they did not bring any children with them. George E. Dooley testified that he met Will Healea frequently after 1900 alone, and has seen Healea and

his wife together, but not frequently, and never saw them with a child; that after Mary died he had a conversation with Will Healea on Main Street in which the witness spoke about Mary Healea's death and that Healea said that he was alone and didn't have any children and was living alone in the southwest part of Bloomington. W. S. Irvin testified that he bought some property from William H. Healea and at that time asked him if he had any heirs and he said no; that witness asked him if he had any children and he said no; that he said he had $1,000 in the Modern Woodmen and didn't know who to leave it to because he did not have any blood relations; that this conversation was two years ago on the curb at the east side of the courthouse. J. M. Taylor testified that in the fall of 1927 he asked Will Healea where he had been and he said to the Atlanta fair; that witness then asked him if he wasn't getting a little reckless and he said, "I and you are in the same fix; we have no children to leave our money to and we might as well spend it." Willis Haison testified that he spent the night with William H. Healea once four or five years after the latter's wife died and there was nobody else there; that Healea told the witness he had heard that people that never had any children never got along very well and said that he and his wife never had any children and they got along as well as anyone. Witness said he saw Healea and his wife once out at the farm and once at the cemetery and there was no child with them on those two occasions; that one time he was walking down the street with Healea and they met a woman whom Healea introduced as his wife's niece; that witness cannot identify appellant as that woman.

Taylor Goddard testified that he is the husband of Julia Livingston Goddard, a sister of Mary Livingston; that about the 15th day of March, 1884, Mary Livingston came to the farm of witness near Arrow-

smith and stayed a day or two; that while there the witness, his wife and Mary went to a dance at Arrowsmith and that Mary danced with several men but not with the witness. In answer to a question asking him to describe her appearance with reference to carrying a child or otherwise, the witness said he couldn't see any difference from her than he ever did before or since. Witness also said that Mary Livingston was again at his place about the 16th day of May, 1884, on a Tuesday or Wednesday with her mother, and that at that time she showed no indications of having been sick with child. The witness also testified that he never knew of Will Healea going with Mary Livingston prior to 1884 and never heard any rumors in 1884 or shortly thereafter that the child left on the Williams' doorstep was Mary Livingston's.

The witness could not remember his own age within several years or the age of his son, who was born on May 22 or 27, 1884, and stated he was either 42 or 43 years of age in December, 1927. The witness evidenced great interest in the cause on behalf of appellees and had come from Indiana with his wife to assist appellees.

Julia Livingston Goddard testified that she is the wife of Taylor Goddard; that her second son, Claude was born on May 26, 1884, and not May 22 or May 27, or in December as her husband testifies; that witness did not go to the dance at Arrowsmith with her husband and Mary Livingston as her husband testified she did. She admits on cross-examination that in the probate court she testified she was at the dance, but says that when she answered in the circuit court on direct examination that she was not at the dance, that she was not testifying about the dance in 1884; witness then says again that she was not at the dance in 1884. Then the witness was recalled and says she was at the dance but did not dance. She says she never

thought of such a thing as Mary Livingston carrying a child at the time of the dance and says Mary showed no evidence of having been sick when she saw her in May, 1884; that she never heard in her family anything about Mary having a child; that she did not know Will Healea ever went with her sister Mary and she and her family were surprised when she heard they were married; that she has heard appellant call William H. Healea "Uncle Will."

Other witnesses were produced who testified they had heard deceased say that he had no children and A. L. Lemons testified he was at a dance at Arrowsmith on a Thursday night in the middle of March, 1884, and was introduced to a Miss Livingston by Taylor Goddard who said she was his wife's sister; that she had her coat off and it didn't look like she was carrying a child, but witness says he cannot tell whether a woman is pregnant or not by looking at her. The witness also remembers that Mrs. Goddard did not dance that particular night 44 years ago, and did not take her coat off but that she got out of the vehicle.

Witnesses testified that deceased had told them that he had no will and when he died one-half of his property would go to his brother John and one-half to the children of a brother. Appellee produced the testimony of Dr. J. H. Copenhaver who testified that he is a physician practicing in Belleflower, Illinois, and was physician for Mary Healea in 1916, and made an examination of her pelvic-abdominal organs; that she was suffering from fibroid tumor of the uterus breaking down to a cancerous condition; that the witness does not say she had a cancer; that she was having a serious discharge and the uterus and tumor combined were three-quarters the size of a man's head; that he found no scarred tissue indicating lacerations from childbirth, and expresses the opinion that Mary

Healea had never given birth to a child. Dr. J. H. Fenelon testified that he read Dr. Copenhaver's testimony and that in his opinion a physician, making such an examination of a woman in the condition described, would be able to tell whether or not that woman had ever given birth to a child. Dr. H. L. Howell testified that he also read Copenhaver's testimony and his opinion is that in a vast majority of cases the physician could tell from such an examination of such a woman whether or not she had ever given birth to a child.

On the other hand, Dr. John W. Fulwiler and Dr. E. M. Stevenson both testified in answer to a hypothetical question based on the evidence, that a physician, making such an examination of a woman in the condition described, could not tell whether or not the woman had ever given birth to a child. Both of these doctors testify that they have known of cases of childbirth without there being any lacerations and consequently without leaving any scarred tissue; that in a majority of cases of birth of a first child there are lacerations in the mouth of the womb, but it is by no means the rule.

Appellant assigns error upon the admission in evidence of certain exhibits purporting to be two photostatic copies of letters written by William H. Healea on or about June 1, 1920, to A. N. Bort, head clerk of the Modern Woodmen at Rock Island in regard to a policy of insurance held by Healea in said company. These copies are not shown to have been written or signed by the deceased and are certified by said head clerk under section 15 of the Evidence Act, Cahill's St. ch 51, ¶ 15, as part of the books, papers, correspondence and records of the Modern Woodmen of America without further proof. The purport of the letters was that his wife was dead and he desired to have the policy transferred to appellant, who was dependent upon him but not of his own blood;

that she was his wife's niece. He also inquired if he could leave the fund to his executor, though if he should marry again he would want to leave it to his wife. In connection with this also there was an application of considerable length purporting to have been made and signed by Healea, answering numerous questions along the same line, showing a relationship and care that the insured had over appellant and his solicitation for her welfare, in which he states that she is not related to him by blood but by marriage, she being his niece. He states her age in 1920 as 24. This paper is certified in the same manner by the head clerk as a part of the books, papers, correspondence and records of the company. There is no other proof of these matters and nothing to show that Healea signed the instruments other than the certificates. Whatever may be the effect of section 15 of the Evidence Act, Cahill's St. ch 51, ¶ 15, as it may pertain to the business of the Modern Woodmen and its affairs in connection with its corporate business and its policyholders, it should be elementary that the certificate of such a corporation or its officers under seal cannot change the rules of evidence or settle the rights of parties in outside matters where the rights and interests of the corporation are in no manner involved. The certificate proves no more than that such a paper is among the papers and memoranda of the company. It may be that in a cause between the Modern Woodmen and Healea the certificate might establish prima facie that Healea wrote the documents. As between the heirs at law of Healea it is a mere document or memoranda which proves nothing. The nature of the memoranda here produced was defined in *Mandel v. Swan Land & Cattle Co.*, 154 Ill. 177, and the court say on page 190:

"The evidence of Reed was as to mailing notice and the entries as to his mailing letters, etc., are a mere memorandum to which he could refer to refresh his

recollection, and not a record of which copies must be made."

Again the court say in this same case: "The original books, and the evidence provided for by sections 15 and 18 of the statute, are original evidence and evidence of a secondary nature is not to be resorted to," etc. The same rule was adhered to in *Chicago, B. & Q. R. Co. v. Weber,* 219 Ill. 372, 382, and the full purpose and intent of the statute was discussed. Appellant Chicago, B. & Q. R. Company introduced a lease in evidence by certificate between it and another railway company in a suit where a third party was interested, and to its introduction appellee strenuously objected. The court say: "If the question were as to the contents of the lease or its provisions, and as between the parties to it, the position taken by the appellee would certainly be sound. But such is not the situation, as we view it. The terms and conditions of the lease were not material or controlling." What is meant by original evidence must be construed as original evidence in some matter in which the corporation is interested. The documents in question were of no more interest or concern to the Modern Woodmen, corporation, than any other possible narrative of purported facts to be gleaned from the daily press or any other source of information. It was error to receive the documents in evidence or to consider them on the hearing in this cause. It is of interest to note that in this application Healea was asked to state:

*Q.* "Give the names and relationship of the nearest blood relatives of said proposed beneficiary.

*A.* "Has none."

Healea further states in the application that appellant "always made my home her home as long as my wife was living." At this time he was furnishing appellant from one to $600 per year and when appellant worked she earned $18 per week.

The proofs in this case are very potent that Mary Livingston Healea was the mother of appellant. Was William H. Healea her father? There is proof in the record that he acknowledged her to various persons to be his child. To consider the evidence of the letters and application made to the head clerk of the Modern Woodmen, which we have held it was error to admit, we are persuaded more strongly to the conclusion that appellant was his child. In 1920, when Healea wrote Bort that appellant was 24 years of age, she was in fact 36 years of age. Why this false statement unless he feared if he gave her correct age it would be making a record that she was born out of wedlock, for the edification of those who knew? He stated that she had no blood relation. The statement is convincing that he had full knowledge of her parentage and knew that her mother was dead. Mary Livingston Healea was born in 1852. Healea was born in 1861. She was 9 years his senior. At appellant's birth the mother was 32 years of age and Healea was 23. At the time of marriage the mother was 37 and Healea was 28 years of age. The disparity of their ages at marriage is a matter of note and may be some corroboration of the history that had passed before. It is argued that appellant addressed the deceased as "Uncle Will," and witnesses testified that he spoke of her as "his wife's niece." This could easily be accounted for from the fact that she lived in the home of her mother's sister until she was 12 years of age and learned to call her own father and mother "uncle" and "aunt." In *Champion v. McCarthy,* 228 Ill., 87, 101, the court say:

"Appellants offered a number of witnesses who were well acquainted with Susan Champion during her lifetime, some of whom had been on very intimate terms with her, and they all testified they had never heard her mention Henry McCarthy as being her son or relative. They also offered in evidence several letters

written by Henry McCarthy to Lydia Cheshire between April 7, 1898 and January, 1905. What these letters contained is not shown by appellants' abstract, except they were addressed to Lydia Cheshire as 'Dear Friend' and 'Dearest Friend,' and signed by Henry McCarthy." Yet the court found he was her son.

In *Bellinger v. Devine*, 269 Ill. 72, 85, the court stated:

"The testimony of the appellants that their brother had stated to them that he had never been married is explained by the testimony of Mrs. Wail, who says that when Raven first asked her, immediately after the death of his wife, to take charge of the baby, Frances, and she asked him why he did not ask his sisters to take charge of her, he replied that he did not want his sisters to know he had been married. For some reason he evidently desired to conceal from his family the fact of this marriage, and this may account for the mis-statements as to his parentage in the application for the marriage license."

In the case at bar it cannot be doubted but that William H. Healea did hesitate and refuse to make a matter of record the full facts as to the birth and parentage of appellant and thus arouse the passions and dissensions in his father's family that such an act would do. It cannot be doubted either but that he did acknowledge appellant to be his child to various persons, and to the end of his life had a care and solicitude for her comfort and happiness that only a parent could have. The testimony is replete with the statements of various witnesses that Healea said appellant was his child, and they are too numerous to be accounted for in this record on any theory that the proofs are manufactured or otherwise than voluntary.

Are the proofs sufficient to establish heirship? Under section three of the chapter on Descent, Cahill's St. ch. 39, ¶ 3, it is provided:

"An illegitimate child, whose parents have inter-married, and whose father has acknowledged him or her as his child, shall be considered legitimate."

The consensus of authority in this State on the subject matter is laid down in *Miller v. Pennington,* 218 Ill. 220, in which the court holds at page 226:

"Our statute . . . is similar to the Indiana statute, which provides that if the father shall marry the mother of a bastard child and acknowledge it as his own, the child shall be regarded as legitimate. In construing that statute the Supreme Court of Indiana has held that an acknowledgment by the father re-moves from the child the status of illegitimacy, no matter what the purpose of the acknowledgment was or whether the father intended to make the child his heir, and that it fixes the status of the child, which cannot be changed by anything the father or mother might afterward say. The court said: 'Having re-moved the "bar sinister" they cannot replace it.' That seems to us to be the correct interpretation of our statute, the purpose of which is to fix the status of the child as legitimate. It seems to us that it would be an unjust and unwarranted construction of the law to say that the father of an illegitimate child, who has legitimated it by marrying its mother and acknowl-edged it to be his, can thereafter change its status by any subsequent declaration."

The court also held in the same case: "An oral acknowledgment, when clearly and satisfactorily proved, is sufficient. . . . All that the statute re-quires in respect to the acknowledgment is that the father shall own or admit the child to be his."

But it is contended by appellees in this case that to establish appellant's contention it is necessary to establish that appellant was born out of wedlock; that Mary Livingston Healea was her mother and that the deceased was her father; that thereafter Mary Liv-

ingston Healea and deceased married and that the father acknowledged appellant as his child and it is insisted that the proofs fail to establish any of these contentions except the marriage.

There is proof in the record that Mary Livingston was delivered of a child in Indiana in 1884; that she went under the name of Madge Arndt and the birth of a female child is recorded at Brownsburg as having been born April 15 of that year. The father's name was given as C. C. Arndt, a salesman, and it is shown that no such person as C. C. Arndt was ever known to have lived in that part of Indiana. The woman Mary Livingston is positively identified by the photographs and the fact that she simulated her own name lends color to the conclusion that the other names were simulated and that no such person as C. C. Arndt existed. The association between Mary Livingston and William H. Healea in 1875 and 1876 and again in 1887 and 1888 and their living in the same home, is shown, and that they married in 1889. We have read the full testimony of the witness Mary Eaton, now 87 years of age, and it bears the stamp of truth upon its face. Mrs. Eaton gives dates and occurrences that fixed the matter in her mind. The rule laid down in *Welch v. Worsley,* 330 Ill. 172, as to declarations in regard to pedigree is: "that before such declarations are admissible in evidence it must be established that the declarant is dead; that the declarations were made before the controversy arose and that the declarant was related by blood or marriage to the family to which the declarations refer." Appellees contend under this rule that no declarations can be shown after appellant left the home of her aunt, Sarah Williams, because she and her aunt Sarah had some controversy about her birth. We cannot agree with appellee's contention. No controversy arose in this case until the death of William H. Healea and there was an estate to

administer and distribute. Any declarations made by relatives, either by blood or marriage, to Mary Livingston Healea and William H. Healea, her husband, prior to the death of William H. Healea are competent in evidence in this cause. All statements made by Mary Livingston Healea and her husband, William H. Healea, in their lifetime, are competent as to the parentage of appellant. The same is true as to Sarah Williams and her husband and as to Charles Razor and his wife. The same rule would be applied to the Goddard family and the immediate family of William H. Healea, deceased. There is proof that a female child was born to Mary Livingston on April 15, 1884, under such circumstances and surroundings as to preclude the presumption of legitimacy. This situation is strongly corroborated by the placing of the child upon the doorsteps of a half sister, its adoption and after 12 years, when the child finds and comes to know its true mother, the repeated and continual assertion by Mary Livingston Healea that it is her child. The child looks like its mother, its training and musical proclivities follow its mother's accomplishments and there can be no reasonable explanation why Mary Livingston Healea should, during her whole life, so persistently claim a child not her own.

William H. Healea also acknowledged appellant as his child. The proofs show that after his wife's death he did not desire appellant to remain in Bloomington and keep house for him, as it would embarrass her and doubtless would embarrass him; but he stated to many people, and especially to his wife's relatives, that appellant was his child. It is more than likely that this was not his attitude among the Healea family and his letters and application to the Modern Woodmen are simple in explanation and strongly corroborative of appellant's contention. He made no application of his Woodmen insurance. He executed no will to aid his

collateral relation among the Healea family. He even forebore to make a record that could bring one tinge of disrespect upon his own child. As the court said in *Metheny v. Bohn,* 160 Ill, 263, 268: "Samuel Bohn for more than eight years thus spoke of and evidenced affection for his son. He spoke of his children, saying he had an adopted daughter and a son,—his own son. With a right of disposition of his property by will it is difficult to conceive a purpose or motive for such declarations and expressions if they were untrue. It is incomprehensible, when all the facts are considered, that such declarations were untrue. That falsehood, deception and feigned affiection were indulged in by Samuel Bohn for years, without motive, necessity or reason, must be found if the claims of appellants are sustained. The deduction can be fairly drawn from this evidence that Samuel Bohn was a man of probity and morality, and as applicable here we cite *Gaines v. New Orleans,* 6 Wall. 642, where the court said, in passing on a somewhat similar question: 'The inquiry naturally arises, what motive had he to declare his child legitimate if he knew the facts were otherwise?' "

In the opinion of this court the testimony preponderates in favor of appellant under the law of this State and the order and decree of the circuit and probate courts of McLean county should be reversed and a decree entered in said probate court finding and determining that appellant, Nellie D. Verne, is the sole heir at law of William H. Healea, deceased.

*Reversed and remanded with directions.*

### ADDITIONAL OPINION ON DENIAL OF PETITION FOR REHEARING

Appellees present a petition for rehearing and argue cross-errors, said to be assigned, but no cross-errors are shown by the abstract to have been assigned, and

many matters of proof offered and the rulings thereon
are discussed, but the proofs and such rulings do not
appear in the abstract, and appellees have presented
no supplementary abstract. As to the letters and
application purporting to have passed from the de-
ceased, William H. Healea, in his lifetime and the
Modern Woodmen of America, it is elementary that in
a collateral matter between third parties, such instru-
ments cannot be certified under section 15 of the Evi-
dence Act, Cahill's St. ch. 51, ¶ 15 but their authen-
ticity must be established. Appellees criticise some of
the language used in *Miller v. Pennington, supra,* and
cite *Welsh v. Worsley,* 330 Ill. 172, 200, in holding:
"But whatever the fact may be as to Swigart's pur-
pose or intention in making any or all of the declara-
tions aforesaid, if he did make all of them, the evidence
for defendants in error establishes beyond all question
that she is not the daughter and heir of Swigart." The
language used in *Miller v. Pennington, supra,* stated
the law as it applied to the facts in that case. The
language used in *Welch v. Worsley, supra,* applied to
a different state of facts. The law must be applied to
the particular facts in each case.

It is contended by appellees, that many of the state-
ments of relatives proven were statements made after
controversy had arisen over the parentage of appellant
and appellees cite *Sugrue v. Crilley,* 329 Ill. 458, 465,
holding: "Pedigree may be proved by hearsay evi-
dence, but it seems to be well settled that a declaration
concerning kinship reproduced as hearsay, to be ad-
missible, must have been made by a person, since
deceased, before a controversy arose, and who was
related by blood or affinity to some branch of the
family the pedigree respecting which is in question.
(*Jarchow v. Grosse,* 257 Ill. 36; *Aalholm v. People,*
211 N. Y. 406 L. R. A. 1915 D 215.) While the author-
ities are not in harmony respecting all of the elements

of this rule, there seems to be no difference of opinion upon the proposition that such declarations are admissible only when the circumstances show they are the natural effusions of a party who is in a position to know the truth and who speaks upon an occasion when his mind is free from bias and without temptation to exceed or fall short of the truth.'' Appellees contend, in their petition for a rehearing, that a controversy arose over this matter, when appellant was about 16 years of age, at the time her Aunt, Sarah Williams, informed her that Mary Livingston Healea was her own mother. This contention is based upon the testimony of Dr. E. C. Williams, who stated, that in a conversation with Sarah Williams, she said to him: ''that Nellie had been offended at her ever since she discovered who her mother was; that she thought she found out at school and came home very much upset because Mrs. Williams hadn't told her that before,'' etc.

This difference does not represent a ''controversy,'' such as was contemplated by the language of the court and in fact this cause never was in controversy, until the death of William H. Healea. From the issues and proofs, as submitted to this court, we are satisfied with the conclusion arrived at on the former hearing and the petition for rehearing is denied.

*Denied.*