THE PEOPLE OF THE STATE OF ILLINOIS, Appellee, v. WILLIAM T. JONES, Appellant.

*Opinion filed May 26, 1988.—Rehearing denied October 3, 1988.*

392

Charles M. Schiedel, Deputy Defender, of the Office of the State Appellate Defender, of Springfield, and Alan Raphael, of Chicago, for appellant.

Neil F. Hartigan, Attorney General, of Springfield (Roma Jones Stewart, Solicitor General, and Marcia L. Friedl, Assistant Attorney General, of Chicago, of counsel), for the People.

JUSTICE MILLER delivered the opinion of the court:

Following a jury trial in the circuit court of Jefferson County, the defendant, William T. Jones, was convicted of murder, attempted murder, armed robbery, residential burglary, and aggravated battery. The defendant waived his right to a jury for purposes of a death penalty hearing, and the trial judge sentenced him to death. The defendant's execution was stayed pending direct review by this court. Ill. Const. 1970, art. VI, §4(b); 107 Ill. 2d Rules 603, 609(a).

On January 26, 1982, Margaret Dare was found dead and her husband, James Dare, was found severely in-

jured in the living room of their home near Dix, Illinois. Blood stains were visible throughout much of the house, and a number of items, including a television set and a stereo phonograph, were missing. The offenses were discovered around 9 o'clock that morning by Mrs. Dare's sister, Lucy Baker. Baker had gone to the house in response to an inquiry from her aunt, who had been trying, without success, to reach Mrs. Dare on the telephone. Baker entered the house through the back door and found her sister slumped on the living room couch; she was dressed in nightclothes and covered with blood. Mr. Dare was struggling from the couch toward the front door; he too was soaked with blood. Baker summoned an ambulance and notified the Jefferson County sheriff's department. Mr. Dare was in deep shock when paramedics arrived, and they were unable to obtain a blood pressure reading, which signified a massive loss of blood. At a local hospital, the attending physician found a deep stab wound to Mr. Dare's left hip, two small puncture wounds in his chest, lacerations on both hands, and a compound skull fracture. An autopsy of Mrs. Dare revealed nine lacerations to her hands and chest; her death was attributed to massive blood loss resulting from a stab wound to her heart.

The defendant previously was convicted of the offenses here and sentenced to death for the murder of Mrs. Dare; he was granted a new trial in an earlier appeal. (See *People v. Jones* (1985), 105 Ill. 2d 342.) On remand, the place of trial was changed from Jefferson County to Saline County, and the jury was sequestered during the proceedings. The defendant does not contest the sufficiency of the evidence of his guilt, and for purposes of the discussion that follows, that evidence is summarized below.

The defendant's wife, Dorothy Jones, testified in the State's behalf at trial. She said that on January 25,

1982, the defendant left the house around 8 p.m. and returned some time after 10 o'clock. He went upstairs, and she heard water running in the bathroom. The defendant left the house again about 10 to 15 minutes later, explaining that he was going over to see two of his friends, Larry Faint and James Jennings. Mrs. Jones said that the defendant called her around 5 o'clock the following morning and said that he was at his sister's house in Decatur. He returned to Mt. Vernon during the evening of January 26. Mrs. Jones also testified that sometime later, in February 1982, she found a blood-stained stocking cap tucked away in her lingerie drawer, and she noticed that the defendant's jacket, which was hanging in their closet, had blood stains on it.

Larry Faint and James Jennings testified that the defendant was at their house sometime after midnight on January 26, 1982, and that the three of them later left for Decatur in the defendant's car. In the backseat were some objects covered with a blanket. The group arrived at the defendant's sister's apartment in Decatur around 5 o'clock that morning. There, the defendant and his sister's boyfriend carried a television set and stereo components into the apartment. The television and stereo had blood on them, and they were cleaned off. Faint testified that they spent that morning and part of the afternoon trying to sell the items; the television was finally sold to a Decatur auction house, where the defendant received $55 in payment. Investigators later traced the television set and were able to identify it, from its serial number, as one that the Dares had bought in May 1981 at a store in Dix.

The defendant's sister, Shirley Jones, testified that the defendant arrived at her apartment around 5 a.m. on January 26. He was accompanied by Faint and Jennings. Jones testified that one of the defendant's fingers was bleeding, and she said that he explained that he had cut

it when he slipped and fell on a patch of ice in the parking lot outside her home. Shirley Jones said that a phonograph and television set were brought in to her apartment from the car; she noticed blood on the phonograph.

Faint and Jennings testified that on their return trip with the defendant from Decatur to Mt. Vernon on January 26 they stopped in Centralia; there they tried to sell the phonograph at a bar but were unsuccessful. Faint and Jennings also said that the defendant had appeared at their home on Saturday, January 23, 1982, with a television set, television stand, and several other items. On that occasion the defendant explained to his friends that he was in the process of moving, and he returned for the things the next day.

The State presented evidence of a burglary and theft that occurred at the home of Dorothy Lacey, located near Mt. Vernon, during the evening of January 23, 1982. Mrs. Lacey testified that a number of things were missing from her home following the break-in, including a television set and stand, several pieces of jewelry, and a homemade quilt. Jewelry and a quilt had been found in a search of the defendant's car on January 27, and at trial Mrs. Lacey identified those items as having been taken from her home. The same quilt was identified by Larry Faint as the blanket he had seen in the backseat of the defendant's car during the early-morning trip to Decatur on January 26. A large butcher knife belonging to Mrs. Lacey was discovered in a dish pan in the Dares' kitchen sink; Mrs. Lacey and her daughter were able to identify the knife from a distinctive nick in its handle.

Forensic scientist Andrew Wist testified to certain consistencies between the known blood types of the defendant and Mr. and Mrs. Dare and blood stains found at the crime scene. Wist said that he was able to distinguish among the blood types of the defendant, Mr. Dare, and Mrs. Dare on the basis of two tests: the ABO group-

ing test, and the PGM enzyme test. The defendant's blood was ABO type B and PGM type 1; Mrs. Dare's blood was ABO type A and PGM type 2—1; Mr. Dare's blood was ABO type B and PGM type 2—1. Wist also provided the frequency of those combinations of blood types in the United States, based on race; according to Wist, 12% of the black population and 6% of the white population share the defendant's combination of ABO and PGM groupings.

Wist analyzed possible blood stains found at the crime scene and in the defendant's car. In most instances, he was able to determine the ABO and PGM characteristics of those samples, and he could therefore conclude whether they were consistent or inconsistent with the blood types of the defendant and the two victims. Wist testified that blood consistent with the defendant's, based on the ABO and PGM tests, was found on the front porch of the Dares' residence and on a number of items inside the house, including a jewelry box, a nightstand, the dust cover of a record turntable, a desk lamp, and the fabric cover of the couch where Mrs. Dare's body was found. Both Faint and Jennings had ABO type O blood, and therefore Wist was able to conclude that they could not have provided the blood that he tested from the crime scene.

Wist also testified to comparisons he made between head hair samples from Mr. and Mrs. Dare and three Caucasian hairs discovered in the backseat area of the defendant's car—one of those hairs was found on a floor mat, and the other two were found in a washcloth. According to Wist, the hairs from the defendant's car had 13 characteristics in common with the hair standards taken from the Dares, which he said were common types. Wist also testified that he examined the stocking cap and jacket that were found by the defendant's wife in February 1982. Wist was able to determine only that

human blood was present on the stocking cap; Wist found several blood stains on the jacket, and one of them was consistent with the defendant's ABO and PGM types.

The defendant testified at trial, and he denied all involvement in the offenses here. The defendant said that during the evening of January 25, 1982, he was at a restaurant in Mt. Vernon, the 12th Street Barbecue Pit, and that he left only once during that period, a little after 10 o'clock, to go home and change his shoes. The restaurant closed shortly after midnight, and at that time the defendant gave a friend a ride home. The defendant testified that he then went to the house where Faint and Jennings lived, arriving between 12:30 and 1 a.m. The defendant wanted to drive to Decatur to visit some family members, but he did not have enough money for both legs of the trip. According to the defendant, Faint suggested that they take some items to Decatur and sell them there to pay for the return trip. Faint then put something in the backseat of the defendant's car, and they left for Decatur.

The defendant said that they arrived in Decatur at his sister's apartment around 5 a.m. He slipped and fell on a patch of ice in the parking lot, reopening a cut on his finger, which, he explained, he had incurred several days earlier while working on his car. A television set and phonograph were removed from the car and taken into his sister's apartment; he did not notice any blood on those items. The television set was sold at an auction store in Decatur later that day, and the defendant explained that the $55 check was made out to him because he was the only one in the group with identification, which the store owner insisted on seeing. They left Decatur around 3 o'clock that afternoon, and on the way back to Mt. Vernon they stopped in Centralia, where an attempt was made to sell the record player. In his testi-

mony, the defendant denied having any role in the break-in and theft at the Lacey house on January 23. He explained that certain items of jewelry found in his car—and identified by Mrs. Lacey as belonging to her—were acquired from a friend at Jennings and Faint's house on January 24 in exchange for a bottle of liquor. The defendant also presented several alibi witnesses, who testified that they saw the defendant at the 12th Street Barbecue Pit in Mt. Vernon during the evening of January 25, 1982.

Following the presentation of evidence, the jury returned verdicts finding the defendant guilty of two counts of murder and one count each of attempted murder, armed robbery, residential burglary, and aggravated battery.

## I

## A

The defendant first argues that the trial court erred in denying a motion for automatic substitution of judge made under section 114—5(a) of the Code of Criminal Procedure of 1963 (Ill. Rev. Stat. 1981, ch. 38, par. 114—5(a)). Following this court's remand of the cause to the circuit court for retrial, the action was placed once again on the call of Judge Lehman Krause, who had presided at the defendant's first trial on these charges. The defendant made a motion for automatic substitution of judge, which Judge Krause denied; he believed that the case was not a new one and therefore concluded that the motion was untimely because of his prior rulings on substantive issues in the case and the passage of time. The defendant then filed a motion for leave to file a complaint for a writ of *mandamus* in this court, seeking to overturn Judge Krause's denial of the automatic-substitution motion. In the exercise of our supervisory author-

ity, we directed Judge Krause to vacate his original order and to allow the motion. The cause was then assigned to Judge Hopkins on July 10, 1985, and two days later, on July 12, the defendant filed a second motion for automatic substitution of judge under section 114—5(a). Relying on the provision in that statute permitting an accused who is standing trial for a capital offense to name two judges as prejudiced, the defendant argues here, as he did in the circuit court, that he was not required to name both judges in the first motion but rather could submit successive motions.

Section 114—5(a) provides:

"Within 10 days after a cause involving only one defendant has been placed on the trial call of a judge the defendant may move the court in writing for a substitution of that judge on the ground that such judge is so prejudiced against him that he cannot receive a fair trial. Upon the filing of such a motion the court shall proceed no further in the cause but shall transfer it to another judge not named in the motion. The defendant may name only one judge as prejudiced, pursuant to this section; provided, however, that in a case in which the offense charged is a Class X felony or may be punished by death or life imprisonment, the defendant may name two judges as prejudiced." Ill. Rev. Stat. 1981, ch. 38, par. 114—5(a).

The defendant asserts that an accused cannot make a meaningful use of the two-judge option provided by section 114—5(a) unless he already knows the identity of the first two judges to whom the case would otherwise be assigned. The defendant concludes that upon reassignment of the cause to a new judge following the granting of a section 114—5(a) motion naming only one judge as prejudiced, an accused charged with a Class X felony or one punishable by death or life imprisonment should be allowed to make a second motion under the statute.

We believe that the plain language of section 114—5(a) contemplates the making of a single motion, in which a defendant who is charged with a Class X felony or an offense punishable by death or life imprisonment may name either one or two judges as prejudiced. The statute permits such a defendant to "name two judges as prejudiced"; it does not say that the defendant may file two motions. Also, the statute provides that "[u]pon the filing of such a motion the court *** shall transfer it to another judge not named in the motion," which indicates that the identities of all judges for whom the defendant seeks substitution would be disclosed in the motion. The defendant's construction of the statute would be contrary to these provisions. Section 114—5(a) formerly permitted all defendants, regardless of the seriousness of the charges, to name two judges as prejudiced. The former version of the statute provided:

> "Within 10 days after a cause involving only one defendant has been placed on the trial call of a judge the defendant may move the court in writing for a substitution of judge or any 2 judges on the ground that such judge or judges are so prejudiced against him that he cannot receive a fair trial. Upon the filing of such a motion the court shall proceed no further in the cause but shall transfer it to another court or judge not named in the motion." (Ill. Rev. Stat. 1977, ch. 38, par. 114—5(a).)

The accepted practice under that provision was to file a single motion. According to the committee comments, "This section allows one motion but the one motion may contain the names of two judges." (Ill. Ann. Stat., ch. 38, par. 114—5(a), Committee Comments, at 253 (Smith-Hurd 1977); see *People v. Rice* (1982), 108 Ill. App. 3d 344, 350; *People v. Scarpelli* (1980), 82 Ill. App. 3d 689, 693; *People v. Davis* (1977), 54 Ill. App. 3d 517, 524-25.) Effective September 26, 1979, the statute was amended to its present form, with the two-judge option now lim-

ited to defendants standing trial for only the most serious offenses. As the language of the current provision demonstrates, the amendment did not have the additional effect of permitting a defendant to file successive motions, when formerly only a single motion was contemplated. The legislature's retention of the language at issue suggests agreement with the judicial construction of that part of the provision. See *People v. Agnew* (1985), 105 Ill. 2d 275, 279-80.

Moreover, our interpretation of section 114—5(a) is consistent with the requirements of a companion provision, section 114—5(b), which governs automatic-substitution motions in cases involving multiple defendants. Section 114—5(b) provides:

> "Within 24 hours after a motion is made for substitution of judge in a cause with multiple defendants each defendant shall have the right to move in accordance with subsection (a) of this Section for a substitution of one judge. The total number of judges named as prejudiced by all defendants shall not exceed the total number of defendants. The first motion for substitution of judge in a cause with multiple defendants shall be made within 10 days after the cause has been placed on the trial call of a judge." (Ill. Rev. Stat. 1985, ch. 38, par. 114—5(b).)

Under this provision, codefendants may be required to submit their motions for automatic substitution of judge before they know to whom the case would otherwise be reassigned following the submission of the initial automatic-substitution motion.

We conclude that the defendant was not entitled to make a second automatic-substitution-of-judge motion and that the trial judge acted in accordance with the statute in denying the defendant's second motion.

## B

The defendant next contends that the trial judge

erred in permitting James Dare to testify without first conducting a hearing on his competency as a witness. The defendant makes the related contentions that the probative value of Mr. Dare's testimony was outweighed by its prejudicial effect, in light of the witness' mental and physical condition, and that the State withheld from defense counsel certain information that would have cast further doubt on Mr. Dare's competency.

Before presenting the testimony of Mr. Dare, one of the prosecutors informed the court and defense counsel that the witness was in a feeble condition. The prosecutor sought permission from the trial judge to ask Mr. Dare leading questions, to have Mr. Dare's social worker present with the prosecutor at the witness stand, and to have Mr. Dare's sister seated in the front of the courtroom so that the witness could see her. The prosecutor explained that having Mr. Dare testify was "somewhat akin to presenting the testimony of a child." Defense counsel responded that a competency hearing should be conducted, if the witness was as the prosecutor had described him. The trial judge suggested that the witness first be examined in chambers, so that the State's requests regarding the presentation of the witness' testimony could be better assessed. Following a brief recess, however, the prosecutor withdrew her request that Mr. Dare be allowed to testify with any special assistance and said that Mr. Dare's testimony would be presented in the same manner as that of any other witness. Defense counsel continued to believe that an *in camera* examination of Mr. Dare's competency would be appropriate, given the State's description of the witness. Noting that the State had withdrawn its request for assistance, the trial judge said to defense counsel:

"The argument they made in support of that assistance I can neither affirm nor deny as being a matter of evidence herein. I will permit examination of any witness they

choose to call next in their order. If you have a motion you want to make, you make a motion; but you are going to have to support it with the same kind of affidavit that they should have supported anything they said with."

The State then called Mr. Dare to the witness stand. After identifying himself and providing the date of his birth, Mr. Dare said that he used to live on the Texico Road, near the town of Dix, with his wife and son. Asked to recall "that night in January of 1982," Mr. Dare said that he retired around the usual time, 10 p.m. The rest of his testimony follows:

"Q. Okay. Did something wake you up in the night?

A. Well, my wife hollered, told me to get up.

Q. Did you get up?

A. Yes.

Q. And what did you do when you got up?

A. I went in the living room, and my wife was on the—in the living room and she was with a colored man.

Q. Do you remember anything else about that night?

A. (No audible response.)

Q. Can you remember anything else, Jim[,] about the night?"

A. (No audible response.)

Q. Can you remember what the colored guy was doing in the living room?

A. (No audible response.)

Q. Can you remember if he said anything to you?

A. (No audible response.)

Q. Did he say anything to you, Mr. Dare?

A. (No audible response.)

Q. Can you tell the jury anything else about that night today?

A. (No audible response.)

[PROSECUTOR]: That's okay. No further questions, your Honor.

[DEFENSE COUNSEL]: No questions, your Honor.

THE COURT: Thank you, sir."

Mr. Dare then left the witness stand.

The defendant argues that the trial judge erred in not conducting an inquiry into Mr. Dare's competency before permitting him to testify in this case. The defendant further asserts that even if trial counsel did not make a proper motion for a competency hearing, the failure to hold one in this case constituted plain error (see 107 Ill. 2d R. 615(a)), in light of Mr. Dare's obvious disability. See *People v. Edwards* (1973), 55 Ill. 2d 25.

We do not believe that the trial judge erred in failing to conduct a preliminary inquiry into Mr. Dare's competency as a witness. In requesting a preliminary hearing, defense counsel simply relied on the State's representations concerning Mr. Dare's condition and offered no additional basis for holding such a hearing. The concerns mentioned by the State would not, however, warrant a hearing on competency. A witness is competent to testify if he has the capacity to observe, recollect, and communicate. (*People v. Dixon* (1961), 22 Ill. 2d 513, 516; *Schneiderman v. Interstate Transit Lines, Inc.* (1946), 394 Ill. 569, 578; *Truttmann v. Truttmann* (1927), 328 Ill. 338, 341.) The State's proposal that friends of Mr. Dare be permitted near him while he was on the witness stand did not pertain to the criteria of competency.

Nor do we agree with the defendant that Mr. Dare's testimony suggests that he was not competent to testify. Notably, the record in this case demonstrates that the trial judge believed that Mr. Dare was a competent witness. In rejecting a challenge to Mr. Dare's testimony raised in the defendant's post-trial motion, the trial judge remarked on defense counsel's failure to object to the testimony or ask that it be stricken. The trial judge said that he believed that defense counsel had failed to make that objection because counsel had concluded, just as he had concluded, that the testimony was competent. A trial judge's finding that a witness is competent to testify will not be reversed on appeal unless it is an

abuse of discretion. (*People v. Garcia* (1983), 97 Ill. 2d 58, 75.) The trial judge's assessment of Mr. Dare's competency was not an abuse of discretion.

The defendant makes the related contention that the State withheld from defense counsel additional information about Mr. Dare's mental condition. According to the defendant, this information first came to defense counsel's attention at the capital sentencing hearing, during the State's presentation of evidence regarding the treatment that Mr. Dare required in the aftermath of the offenses here. Testifying at the hearing, Mr. Dare's sister, Betty Webb, explained that she was appointed his legal guardian in April 1984. Barbara Delanois, a social worker employed at the Danville Veterans Hospital, where Mr. Dare received treatment following the attack here, testified that he was declared incompetent sometime before August 1985.

The defendant makes no allegation that the State's failure to disclose that information was in violation of any discovery obligation or order. Nor are we convinced of its relevance. A witness is not rendered incompetent to testify by the appointment of a conservator to manage his property (*Champion v. McCarthy* (1907), 228 Ill. 87, 99), or by an adjudication of feeblemindedness (*People v. Lambersky* (1951), 410 Ill. 451, 454; *Oswald v. Civil Service Comm'n* (1950), 406 Ill. 506, 509-11). The defendant does not point to any statutory provision making Mr. Dare incompetent to testify; without some basis for that conclusion, we decline to assume that the appointment of a legal guardian for his person and estate would have had the same effect.

The defendant would also find a constitutional ground for excluding Mr. Dare's testimony. The defendant contends that the witness' inability to respond to further questions resulted in a denial of the confrontation guarantee of the Federal Constitution, as applied to the

States. (See U.S. Const., amends VI, XIV; *Pointer v. Texas* (1965), 380 U.S. 400, 13 L. Ed. 2d 923, 85 S. Ct. 1065.) "It cannot seriously be doubted at this late date that the right of cross-examination is included in the right of an accused in a criminal case to confront the witnesses against him." (*Pointer*, 380 U.S. at 404, 13 L. Ed. 2d at 926, 85 S. Ct. at 1068.) The defendant's contention here is not that cross-examination was frustrated by the witness' inability to recall certain events, but rather that cross-examination was precluded by the witness' inability to respond to any further inquiry. (See *People v. White* (1968), 40 Ill. 2d 137 (complaining witness could communicate only by moving one of her knees; right of cross-examination held to have been violated); *cf. United States v. Owens* (1988), 484 U.S. 554, 98 L. Ed. 2d 951, 108 S. Ct. 838 (complaining witness unable at trial to identify defendant as his assailant; no violation of confrontation clause in admission of complaining witness' testimony regarding previous, out-of-court statements identifying defendant as assailant); *Delaware v. Fensterer* (1985), 474 U.S. 15, 88 L. Ed. 2d 15, 106 S. Ct. 292 (no confrontation violation in admission of opinion testimony by expert unable to recall basis for forming opinion).) In this case, however, defense counsel made no attempt to question Mr. Dare, and we decline to speculate whether the witness would or would not have responded to cross-examination on those matters to which he testified on direct. Without more, we are unable to conclude here that the defendant was denied his right to confront the witness.

The defendant also argues, as a related contention, that the prejudicial effect of Mr. Dare's testimony outweighed its probative value. As we have noted, defense counsel did not move to strike the testimony. Moreover, we cannot say, from the record before us, that the testimony was not probative, or that its probative value was

outweighed by the prejudice that might have accrued to the defendant. Certainly the testimony was probative. Mr. Dare provided information concerning the time of the attack and the race and gender of the person who was with Mrs. Dare. That testimony was obviously material to the State's case, and we find no basis here for concluding that its value was outweighed by whatever sympathy Mr. Dare's condition may have stirred in the jurors.

## C

The defendant next argues that the trial judge erred in denying a defense motion for a mistrial made after a prosecution witness alluded to the defendant's earlier trial on these charges. The remark complained of came during testimony by one of the State's chain-of-custody witnesses concerning tubes of Mr. Dare's blood. Asked whether she had seen the tubes later, the witness replied, "Just at the last trial." The State ended its direct examination of the witness at that point, and outside the jury's presence defense counsel moved for a mistrial. The trial judge denied the motion. The judge found that the State had not intended to elicit that particular response from the witness. The trial judge also suggested that the jury might not have heard the witness, though in denying the motion he assumed that the jury had actually heard the answer. The trial judge then offered to let defense counsel choose an appropriate remedy, proposing that the jury could be instructed, with varying degrees of specificity, to disregard the witness' answer, or that the noon recess could be taken, with no admonition given. Defense counsel declined to make a choice, and the trial judge instructed the jurors to disregard the last question and answer of the witness. The defendant contends here that the prejudicial effect of the statement continued throughout the trial. For impeachment pur-

poses the parties had agreed to direct witnesses' attention to their testimony given at "a prior hearing in July 1982," and the defendant believes that the jurors likely understood that phrase as also alluding to the earlier trial, in light of the witness' reference to "the last trial."

We do not believe that the remark in question warranted the declaration of a mistrial. *People v. Davis* (1983), 97 Ill. 2d 1, which the defendant relies on, involved a different problem. There, the court found error in the use of evidence at the first stage of a death penalty hearing that the defendant had already been sentenced to death in an earlier, unrelated prosecution. The *Davis* court believed that the information was irrelevant and that it could have proved prejudicial, either by adding the weight of the other sentencing jury's determination to the resolution of any doubtful issue, or by lessening the jury's sense of the significance of its own decision.

The information that was presented here is far different from what was found to be prejudicial in *Davis*. The jurors in this case did not learn the outcome of the earlier trial, much less the identities of the parties to that proceeding. Moreover, the trial judge admonished the jurors to disregard the witness' answer, and the jurors later received the standard instruction on the respective functions of the court and the jury, which included a direction to "disregard testimony and exhibits which the court has refused or stricken." (See Illinois Pattern Jury Instructions, Criminal, No. 1.01 (2d ed. 1981).) Finally, we note that the defendant assumes that the jurors would have understood subsequent comments about an "earlier hearing," used in impeachment by agreement of the parties, as referring to the "first trial" mentioned by the witness. We believe, however, that the jurors could just as easily have made the opposite connection and have understood the "first trial" as a reference to the

"earlier hearing." A trial judge is vested with broad discretion in deciding whether to grant a motion for a mistrial (*People v. Hall* (1986), 114 Ill. 2d 376, 405; *People v. Malmenato* (1958), 14 Ill. 2d 52, 63), and we cannot conclude that the brief reference to the earlier proceeding prejudiced the defendant or otherwise impaired his right to a fair trial (see *Walker v. Bishop* (8th Cir. 1969), 408 F.2d 1378).

## D

The defendant also argues that he was denied a fair trial by certain remarks made by the prosecution in closing argument. With only a few exceptions, however, defense counsel neither objected to the comments now complained of nor included them in the post-trial motion. Because of those procedural defaults, the objections may now be deemed waived. (*People v. Whitehead* (1987), 116 Ill. 2d 425, 447.) "Plain errors or defects affecting substantial rights may be noticed although they were not brought to the attention of the trial court" (107 Ill. 2d R. 615(a)), and we shall consider whether the unobjected-to remarks "were so inflammatory that defendant could not have received a fair trial or so flagrant as to threaten deterioration of the judicial process. (*People v. Owens* (1984), 102 Ill. 2d 88, 104.)" *People v. Albanese* (1984), 104 Ill. 2d 504, 518.

The defendant first contends that the prosecutor exaggerated the certainty of the blood and hair evidence introduced at trial. (See *People v. Linscott* (1987), 159 Ill. App. 3d 71, *appeal allowed* (1987), 117 Ill. 2d 549; *People v. Harbold* (1984), 124 Ill. App. 3d 363; *People v. Giangrande* (1981), 101 Ill. App. 3d 397.) The defendant's blood was ABO type B, PGM type 1, and the evidence showed that blood having the same combination of types was found at the Dare residence. The evidence also showed that several head hairs found in the defend-

ant's car were consistent with hair standards taken from Mr. and Mrs. Dare. The defendant argues that the prosecutor made a number of remarks in summation that overstated the significance of the blood and hair evidence. Specifically, the defendant now objects to the following comments by the prosecutor: "[the defendant] left his calling card at the Dare house"; "ABO B, PGM 1. Unique"; "We know the Defendant is lying because of the physical evidence in this case which does not lie. There's no mistakes [sic] with this physical evidence"; "What would the victims be doing riding in his car ***?" "And you know it's not just the fact that his blood was there at the house"; "So [the defendant] was on the front porch and his blood was found there and no one else's"; "What type of blood was it? It was ABO B, PGM 1. Whose blood is that? It's the defendant's. It's not Jim or Margaret Dare['s] or anyone else['s]"; "Everywhere in the house where a home invader would be, the Defendant left his blood." The defendant contends that the prosecutor's comments misstated the testimony regarding the blood and hair evidence and misrepresented to the jury that the forensic evidence irrefutably established the defendant's presence in the Dares' house.

Defense counsel referred to the matter in her own argument, saying:

> "Despite the way it was worded by Andy Wist and by [the prosecutor], the only thing that is said is that blood that is consistent with the blood type of Mr. Jones was found in the Dare residence. Several times they would state his blood was there. That is not true. They cannot prove that. All they can prove is a blood type which is consistent with 12% of the black population."

We believe that the remarks complained of, construed in context, were accurate statements of the evidence in this case, or fair inferences that could have been drawn from all the evidence in this case. Throughout his argu-

ment, the prosecutor repeatedly noted that the forensic evidence established the consistency between the defendant's blood type and various blood stains found in the Dares' residence. Moreover, the jury was instructed on the purpose of closing argument, and we do not believe that the jurors, having heard the testimony in this case, were misled about the meaning of the forensic evidence.

The defendant also argues that the prosecutor misstated James Dare's testimony in argument to the jury. The defendant complains of the prosecutor's statement that Dare "knew that he had been unable to defend [Mrs. Dare] and that the Defendant had attacked her and killed her before his very eyes." The defendant contends that the State's remark suggested that Mr. Dare had testified that the defendant was the assailant. Mr. Dare did not testify to that, and the defendant claims that the effect of the statement was to violate his confrontation right.

The prosecutor made the particular statement near the beginning of his argument, when he was describing the injuries suffered by Mr. and Mrs. Dare. At other times during argument, however, the prosecutor said that Mr. Dare had testified only to the race and gender of the intruder he had seen. Defense counsel, in her argument to the jury, similarly noted the limited account given by Mr. Dare. We believe that whatever error occurred in the prosecutor's initial statement was harmless, for it was subsequently cured by his, and defense counsel's, correct summaries of the testimony.

The defendant next argues that the prosecutor improperly attempted to impose on the defendant the burden of establishing his innocence. Near the beginning of rebuttal argument the prosecutor said, without objection:

> "They indicate that the evidence must rule out all reasonable theories of innocence. *What reasonable theories of innocence have they given you?* They have not given you

one. They throw that out for your consideration, but their whole case is based on misrepresentations and lies. There are no reasonable theories in this case which are consistent with innocence. The evidence in their case establishes his guilt beyond a reasonable doubt." (Emphasis added.)

Apparently the prosecutor made the remark in response to defense counsel's argument, "The evidence in this case is entirely circumstantial. *** The court will tell you that you should not find the Defendant guilty unless the factors prove, circumstances prove, exclude every reasonable theory of innocence." Defense counsel was referring to the instruction defining the term "circumstantial evidence"; that instruction contains an additional paragraph, used in this case, that says, "You should not find the defendant guilty unless the facts or circumstances proved exclude every reasonable theory of innocence." (Illinois Pattern Jury Instructions, Criminal, No. 3.02 (2d ed. 1981); but see *People v. Bryant* (1986), 113 Ill. 2d 497, 510-12 (discarding "reasonable theory of innocence" paragraph of circumstantial evidence instruction).) The defendant contends that the prosecutor's rhetorical question suggested to the jurors that the defendant was obligated to prove his innocence of the charges.

It is, of course, a fundamental principle of due process that the prosecution must prove every element of an offense beyond a reasonable doubt. (*In re Winship* (1970), 397 U.S. 358, 364, 25 L. Ed. 2d 368, 375, 90 S. Ct. 1068, 1072.) We do not believe that the prosecutor's comment interfered with the jury's proper evaluation of the evidence in this case. The comment made here is different from what occurred in *People v. Weinstein* (1966), 35 Ill. 2d 467, cited by the defendant. The prosecutor in *Weinstein* repeatedly argued to the jury that the defendant had the burden of raising a reasonable doubt of her guilt, and the prosecutor persisted in that line of argu-

ment despite rulings by the trial judge sustaining defense counsel's objections to the statements. In concluding that the improper comments were prejudicial, the *Weinstein* court noted that the prosecutor's argument there "destroyed the presumption of innocence" and "was tantamount to telling the jury that defendant had the burden of proving her innocence." (35 Ill. 2d at 470.) The same conclusion cannot be reached here. The remark complained of here was an isolated comment. Moreover, later in the rebuttal argument the prosecutor reminded the jurors that the State was required to prove the defendant's guilt beyond a reasonable doubt, and the jury was properly instructed by the trial court on the State's burden of proof. For those reasons, we conclude that any error occasioned by the prosecutor's remark would have been later cured by his correct statement of the burden of proof, and by the jury instructions on that.

As a final attack on the State's argument to the jury, the defendant contends that a new trial is necessary because of the cumulative effect of numerous instances of other allegedly improper comments made by the prosecutor. The defendant argues that the prosecutor improperly professed his belief in the defendant's guilt by referring to him as a "happy-go-lucky killer" and by saying that "there is is no question about [the defendant's] guilt in this case *** I submit that the Dares were not much of a match for William T. Jones *** But perhaps that's the kind of victim he likes." These comments were, we believe, sufficiently related to the testimony in this case to constitute reasonable inferences drawn from the evidence presented here.

The defendant also complains that the State misrepresented his criminal history: "Criminals like William T. Jones. *** sneak about in the middle of the night *** They kill and they maim." The defendant notes that he did not have any prior convictions for murder or man-

slaughter or for any offense involving personal injury to a victim. We do not believe that the statement was factually incorrect. The prosecutor was referring to the defendant's conduct for which he was standing trial, not to his previous record. Again, that was a fair comment on the evidence.

The defendant also complains of several other comments made by the prosecutor in argument that, he believes, could only have inflamed the emotions of the jurors. Again, no contemporaneous objections were made to this material. In summarizing the evidence, the prosecutor said of Mr. Dare, "They weren't able to see the real injuries to Jim Dare because he bore them on the inside." The prosecutor also said:

> "Following this crime Jim Dare's a widower and he's an invalid and I submit that no one could have seen those injuries on January 26. But when he came here and testified in this courtroom, they were readily apparent. Due to this crime, Jim Dare's destined to live out his life alone as an invalid and without his wife."

The defendant contends that the references to Mr. Dare's injuries and to the loss of his wife were irrelevant and prejudicial.

That Mr. Dare had been left a widower by the offenses here was irrelevant to the defendant's guilt or innocence of the charges. But not every reference at trial to a decedent's surviving family members will be reversible error. (*People v. Simms* (1988), 121 Ill. 2d 259, 269; *People v. Hope* (1986), 116 Ill. 2d 265, 276.) The prosecutor did not dwell on Mr. Dare's loss of his wife, and it was a matter obvious from the properly admitted evidence in this case. With respect to the prosecutor's comment on Mr. Dare's injuries, the remark seemed designed to account for the witness' incomplete testimony. Assuming that the reference to injuries was error, we do

not believe that its effect was to deny the defendant a fair trial.

For his final examples of improper argument, the defendant refers to three comments to which defense counsel made contemporaneous objections. In the first, the prosecutor noted that the defendant had been indicted by a grand jury for the offenses here. In the second, the prosecutor said that the defendant's testimony "in July of 1982" contradicted his present testimony given on his reason for calling his wife after he arrived in Decatur. In the third remark, the prosecutor offered to "match the credibility of these law enforcement officer[s] against this convicted felon any day"; the prosecutor was referring to testimony by two troopers regarding an attempt by the defendant to rinse and discard the shirt he had been wearing at the time of his arrest on the charges here. It is not clear from the record what ruling the trial judge made on the first remark, but he overruled defense counsel's objections to the remaining two.

The reference to the grand jury indictment came at the beginning of argument, when the prosecutor was reviewing the procedural history of this case. The jurors received the standard instruction informing them that the indictment was merely the formal method of charging the defendant with the offenses here and that was not evidence and did not give rise to any inference of guilt. (See Illinois Pattern Jury Instructions, Criminal, No. 2.02 (2d ed. 1981).) We do not believe that the jury would have understood the prosecutor's comment on the indictment in an erroneous manner. With respect to the prosecutor's reference to the defendant's earlier testimony, we note that the defendant's testimony had been properly impeached, and the prosecutor referred to the earlier testimony in the manner agreed upon by the parties. With respect to the prosecutor's statement endors-

ing the credibility of several witnesses, the remark complained of was brief, and we do not believe that it had the effect of denying the defendant a fair trial.

In sum, having reviewed the State's argument at trial, we do not believe that the remarks now complained of operated to deny the defendant a fair trial.

Having considered and rejected the defendant's contentions of trial error, we affirm his convictions for murder, attempted murder, armed robbery, residential burglary, and aggravated battery.

## II

Following the defendant's convictions, the State requested a hearing to determine whether the death penalty should be imposed. The defendant waived his right to a jury for that purpose, and the sentencing hearing was conducted on October 16 and 17, 1985. The State presented, as evidence in aggravation, the defendant's criminal record and information describing the nature and extent of the injuries suffered by Mr. Dare as a result of the attack on him. According to the evidence presented at the sentencing hearing, the defendant had a juvenile adjudication in St. Clair County in 1968 involving the theft of a purse, for which he was committed to the custody of the youth authorities. The defendant's adult record includes a conviction for burglary in Sangamon County in 1974, resulting in an indeterminate prison term of two to six years, and convictions on two counts of armed robbery and one count of burglary in St. Clair County in 1978, for which the defendant was sentenced to concurrent seven-year terms of imprisonment.

In mitigation, the defendant introduced evidence of his good conduct while in custody, as well as testimony from several family members, including his mother. The defendant had been placed on death row at Menard Cor-

rectional Center following his initial conviction and death sentence in 1982, and a captain, lieutenant, sergeant, and correctional officer from the prison testified at the hearing that the defendant was well-behaved and nonviolent and that he did not cause problems. Sharing a similar opinion was a retired chaplain from Menard, who also testified in the defendant's behalf at the sentencing hearing. According to this witness, the defendant had frequently attended the weekly Bible classes and church services conducted at the prison. Further favorable testimony regarding the defendant's conduct while in custody was provided by a Jefferson County sheriff's deputy, by a part-time jailer in that county, and by a resident of the county jail, all of whom had been in contact with the defendant during various stages of his trial here; these witnesses attested to the defendant's good behavior.

Also testifying in the defendant's behalf at the sentencing hearing was an attorney who had represented the defendant in his initial appeal. That attorney said that he considered the defendant to be an intelligent, pleasant, and cooperative person. This witness also described an occurrence in May 1984, when he and another lawyer went to Menard to meet with several prisoners. The witness said that the defendant and another prisoner warned them that one of the inmates whom they were planning to meet had threatened to attack an attorney. Based on that warning, the lawyers cancelled their meeting with the particular inmate. An affidavit to that effect from the other attorney involved in the matter was admitted into evidence.

Further evidence in mitigation was provided by the defendant's mother, two of his sisters, and a cousin by marriage. These witnesses recounted their favorable impressions of the defendant, and they described him as a generous and peaceful person.

At the conclusion of the hearing, the trial judge found that eligibility for the death penalty was established by proof that the defendant was born in 1955 and therefore was over 18 years of age at the time of the murder of Mrs. Dare, and that the murder occurred in the course of the defendant's commission of the felony of armed robbery. (See Ill. Rev. Stat. 1981, ch. 38, par. 9—1(b)(6).) The trial judge further found that there were no mitigating circumstances sufficient to preclude imposition of the death penalty and therefore sentenced the defendant to death for the murder of Mrs. Dare. The trial judge did not sentence the defendant on his other convictions.

## A

The defendant's first argument in opposition to his capital sentence is that death is not an appropriate penalty in this case. He contends that his good conduct while in prison and residual doubts concerning his guilt demonstrate the existence of "mitigating circumstances [that] do not bespeak a man with a malignant heart who must be permanently eliminated from society" (*People v. Carlson* (1980), 79 Ill. 2d 564, 590; see *People v. Buggs* (1986), 112 Ill. 2d 284 (vacating death sentence and remanding for imposition of sentence other than death); *People v. Gleckler* (1980), 82 Ill. 2d 145 (same)). The defendant therefore asks that his death sentence be vacated and that the cause be remanded for imposition of a sentence of imprisonment instead.

Favorable evidence of a defendant's conduct while incarcerated is potentially mitigating and therefore relevant and admissible at a capital sentencing hearing. In *Skipper v. South Carolina* (1986), 476 U.S. 1, 90 L. Ed. 2d 1, 106 S. Ct. 1669, the Court held that the trial judge in that case had erred in refusing to permit the defendant to introduce at a death penalty hearing evidence of his conduct in custody while awaiting trial. Such evi-

dence would permit the sentencing authority—in that case, a jury—to draw favorable inferences regarding the defendant's "character and his probable future conduct if sentenced to life in prison." *Skipper*, 476 U.S. at 4, 90 L. Ed. 2d at 6-7, 106 S. Ct. at 1671.

In this case, the defendant presented a number of witnesses who testified about his good conduct while in prison. The defendant contends that the trial judge misconstrued the relevance of the evidence, considering it only as it reflected on the defendant's mental abilities. Discussing the evidence regarding the defendant's conduct while incarcerated, the trial judge said:

> "I look at mitigation. All of the evidence that was presented for purposes of mitigation had to do with the defendant's post-event activities while incarcerated in an institution, his relationship with parole officers, and others, lawyers, clerks of law, persons who transported the defendant from the jail to the library. Offering a picture of the defendant as being an extraordinarily intelligent, well spoken, certainly a man who knows his own mind and his own intentions. Capable of expressing himself post-event, after the occurrence of the crime in question with all due degree of civility, politeness and decorum. Rather than mitigate to this court, I find that the knowledge and mastery of communicative skills, intellect, and the use of that intellect makes this crime all the more heinous considering its degree of severity. We are not dealing with an ignorant human being who has no knowledge of the affairs of life. Nor are we dealing with one incapable of learning. No, we are dealing with one who shows to us an extraordinarily well[-]developed sense of learning capability and knowledge. Extraordinary, I use the word from the point of view as used in the arguments to me. This is not a typical resident of our penitentiaries, pursuant to what the officers have told me. This is one of the most intelligent defendants that these officers have had to deal with from their very words."

We do not construe the trial judge's remarks as showing that he erroneously failed to consider the evidence of the defendant's good conduct while incarcerated. It seems clear that the trial judge, in summarizing the mitigating evidence, was referring only to information that he found particularly noteworthy, in light of the circumstances of this case. In her argument at the sentencing hearing, defense counsel stressed the favorable evidence of the defendant's conduct as an inmate, arguing that it showed the defendant's potential for rehabilitation and his ability to function well in prison. The evidence concerning the defendant's good conduct was brought to the trial judge's attention, and we find no basis here for concluding that the trial judge refused or failed to consider it.

The defendant also contends that the death sentence is an inappropriate and excessive disposition in this case. In support of that argument, the defendant relies on the mitigating evidence of his conduct in prison, together with what he believes are residual doubts concerning his guilt for the offenses. An argument for lenity based on residual doubt of guilt is perhaps more properly addressed to the sentencing authority, when the sentencer has also acted as the trier of fact in the determination of a defendant's guilt. (See *Lockhart v. McCree* (1986), 476 U.S. 162, 181, 90 L. Ed. 2d 137, 153, 106 S. Ct. 1758, 1769 (in rejecting argument that death qualification of jurors for capital case results in biased jury, mentions State's interest in having same jury for both trial and sentencing; notes that a defendant might benefit, because jurors having residual doubts of guilt might favor sentence of imprisonment).) We do not intend to consider here what role residual doubt may play in sentencing proceedings conducted under the Illinois death penalty statute. (*Cf. Burr v. Florida* (1985), 474 U.S. 879, 88 L.

Ed. 2d 170, 106 S. Ct. 201 (Marshall, J., dissenting, joined by Brennan, J.) (urging Court to grant review in case in which State supreme court rejected argument that residual doubts of defendant's guilt were appropriate grounds for jury's recommendation of sentence of imprisonment rather than death); *Heiney v. Florida* (1984), 469 U.S. 920, 83 L. Ed. 2d 237, 105 S. Ct. 303 (same).) We note, however, that the same argument for lenity was presented to the trial judge, who acted as the sentencer in this case. The trial judge rejected the argument, as do we. See *People v. Johnson* (1987), 119 Ill. 2d 119, 147-48.

At the sentencing hearing, defense counsel argued that the evidence of the defendant's guilt was entirely circumstantial and weak, and that the trial judge therefore should resolve those lingering doubts of guilt in favor of lenity in deciding whether to impose the death penalty in this case. The trial judge, however, had no doubt of the defendant's guilt. In finding the defendant eligible for the death penalty, the trial judge said, "I find beyond [a] reasonable doubt, beyond a shadow of doubt, by overwhelming evidence, evaluating every bit of evidence at this trial albeit circumstantial, that the defendant William T. Jones committed the act of the murder of Margaret Dare and was in the course of armed robbery as well as other things in the home of Margaret Dare." Later, in considering the nonexhaustive list of mitigating circumstances set out in the death penalty statute, the trial judge said, "I find specifically beyond a reasonable doubt [that] the defendant was personally present during the commission of these acts causing the death and personally was involved in committing the acts causing the death." (*Cf.* Ill. Rev. Stat. 1981, ch. 38, par. 9—1(c)(5) (recognizing as a mitigating circumstance that "the defendant was not personally present during commission of the act or acts causing death")).) Clearly, the trial

judge had no residual doubt of the defendant's guilt, and he considered the death penalty to be the appropriate penalty here.

Like the trial judge, we have no residual doubt of the defendant's guilt. The evidence at trial established that the defendant was in possession of property belonging to the Dares soon after the occurrence of the offenses here. Also connecting the defendant to the crimes were the proceeds from the Lacey break-in; a knife belonging to Mrs. Lacey was found at the Dares' home, and other items taken from the Lacey home were found in the defendant's car. Finally, forensic evidence established that blood consistent with the defendant's was found at the crime scene, and hairs consistent with hair standards from the Dares were found in the backseat area of the defendant's car.

Imposition of the death penalty requires, as a constitutional matter, an individualized consideration of the offender's character and the circumstances of his crime. (*Eddings v. Oklahoma* (1982), 455 U.S. 104, 110-12, 71 L. Ed. 2d 1, 8-9, 102 S. Ct. 869, 874-75.) In this case, "[t]o be convinced of defendant's guilt is to be convinced of the ruthless manner in which he acted." (*People v. Sanchez* (1986), 115 Ill. 2d 238, 276.) Giving full consideration to the defendant's conduct, his character, and his record, we do not believe that the trial judge's decision to impose the death sentence in this case was excessive or disproportionate.

### B

The defendant also argues that a new sentencing hearing is required because the trial judge considered certain victim impact evidence in deciding to impose the death penalty, in violation of the Supreme Court's decision in *Booth v. Maryland* (1987), 482 U.S. 496, 96 L. Ed. 2d 440, 107 S. Ct. 2529. The information complained

of was contained in the victim impact summary of a presentence investigation report. It contained a brief description of Mr. Dare's injuries and course of treatment following the offenses here, and it also referred to Mr. Dare's loss of his wife. The defendant believes that the trial judge's reliance on the victim impact information is apparent from the record. Announcing his decision to sentence the defendant to death, the trial judge said, "I have reviewed the presentence investigation with the limitation that I took no cognizance of any parole review *per se*, with the cognizance of criminal conviction, and the defendant's history, and victim impact, and all the matters prescribed by statute for the purpose of presentence investigation."

The defendant in *Booth* had been convicted in the murders of an elderly married couple, and the prosecution introduced into evidence at the capital sentencing hearing a victim impact statement containing a lengthy analysis of the effects of the crimes on the surviving family members. That information had been compiled from interviews with the family members, in which they described their reactions to the offenses and their characterizations of the offenders. The Court ruled that use of the victim impact evidence at the capital sentencing hearing violated the eighth amendment to the Constitution, as made applicable to the States by the fourteenth amendment (U.S. Const., amends. VIII, XIV). The Court believed that the victim impact statement introduced irrelevant circumstances into the sentencing decision and could divert the sentencing authority—in that case, a jury—from its consideration of the defendant and the offenses.

The information contained in the victim impact statement used here is far different from the information at issue in *Booth*, and we do not believe that the decision in that case would require its exclusion. The evidence here

consisted of a one-page section of the presentence investigation report that was prepared in this case. That section, called "Victim Impact Analysis," recounts information obtained by a probation officer in interviews with Mr. Dare, his nephew, and his sister. The analysis contains a brief description of Mr. Dare's physical injuries, his periods of hospital stays for psychological treatment, his medical expenses, and his living arrangements with his sister. The victim impact analysis also notes Mr. Dare's statement that he lost his wife in the occurrence. We note that the defendant's argument on this issue is confined to the material contained in the victim impact statement. There was also testimony at the sentencing hearing, however, concerning Mr. Dare's injuries and treatment following the commission of the offenses here. Defense counsel did not object to the testimony, and the defendant does not argue here that the testimony was improperly admitted under *Booth*.

We do not believe that the information contained in the victim impact statement was admitted in violation of *Booth*. Mr. Dare's injuries occurred as a direct consequence of the defendant's acts. In *Booth* the Court noted, "Our disapproval of victim impact statements at the sentencing phase of a capital case does not mean, however, that this type of information will never be relevant in any context. Similar types of information may well be admissible because they relate directly to the circumstances of the crime." (*Booth*, 482 U.S. at 507 n.10, 96 L. Ed. 2d at 451 n.10, 107 S. Ct. at 2535 n.10.) The evidence concerning Mr. Dare's injuries related "directly to the circumstances of the crime," and therefore its admission into evidence at the defendant's capital sentencing hearing was not error.

We do not believe that the reference in the presentence report to Mr. Dare's loss of his wife was prejudicial. Both the marital relationship and Mrs. Dare's death

were matters obvious from the evidence in this case. (See *People v. Simms* (1988), 121 Ill. 2d 259, 268.) There was no effort here to emphasize Mr. Dare's loss of his wife, or to use that as an improper basis for sentencing the defendant to death.

## C

The defendant also makes several challenges to the validity of the Illinois death penalty provisions under the eighth and fourteenth amendments to the United States Constitution (U.S. Const., amends. VIII, XIV). The defendant first contends that various aspects of the Illinois death penalty statute (see Ill. Rev. Stat. 1981, ch. 38, par. 9—1) invite its arbitrary and capricious imposition. This court has previously upheld the same features of the statutory scheme against constitutional attack, and we adhere to those decisions. The sentencing scheme is not invalid for the discretion it vests in a prosecutor in deciding whether to seek the death penalty in a particular case. (*People v. Lewis* (1981), 88 Ill. 2d 129, 146; *People ex rel. Carey v. Cousins* (1979), 77 Ill. 2d 531, 534-43.) There is no constitutional requirement that the defense be provided with pretrial notice of the aggravating circumstances that the State intends to use at the sentencing hearing. (*People v. Gaines* (1981), 88 Ill. 2d 342, 369.) Once a defendant's eligibility for the death penalty is established, the decision whether to sentence him to death requires a balancing process; thus, there is no constitutional requirement that the State bear a burden of persuasion at that second stage of the sentencing hearing (*People v. Eddmonds* (1984), 101 Ill. 2d 44, 68; *People v. Garcia* (1983), 97 Ill. 2d 58, 80-82; *People v. Free* (1983), 94 Ill. 2d 378, 421; *People v. Brownell* (1980), 79 Ill. 2d 508, 534), and the statutory scheme does not have the effect of casting on a defendant the burden of establishing mitigating circumstances suffi-

cient to preclude imposition of the death penalty (*People v. Morgan* (1986), 112 Ill. 2d 111, 147-48; *People v. King* (1986), 109 Ill. 2d 514, 546-47; *People v. Caballero* (1984), 102 Ill. 2d 23, 49). The statute is not invalid for failing to require the sentencing authority to make a separate finding that death is the appropriate penalty. (*People v. Whitehead* (1987), 116 Ill. 2d 425, 462-63; *People v. Morgan* (1986), 112 Ill. 2d 111, 147; *People v. Albanese* (1984), 104 Ill. 2d 504, 536-37.) And it is not necessary that a capital case be submitted to a scheme of comparative proportionality review. (*People v. King* (1986), 109 Ill. 2d 514, 551; *People v. Stewart* (1984), 104 Ill. 2d 463, 499; *People v. Kubat* (1983), 94 Ill. 2d 437, 502-04; *People v. Brownell* (1980), 79 Ill. 2d 508, 541-44.) In light of the court's previous holdings, we reject the defendant's further argument that the sentencing procedure is made arbitrary and capricious by the cumulative effect of those challenged aspects of the statute.

The defendant also contends that the capital sentencing scheme is unconstitutional because those persons who must be tried with the aid of certain forms of special communicative assistance are statutorily exempt from receiving the death penalty. (See Ill. Rev. Stat. 1981, ch. 38, pars. 104—22, 104—26(b).) We have previously held that the exemption does not impair the constitutionality of the capital sentencing provisions (see *People v. Whitehead* (1987), 116 Ill. 2d 425, 460-62), and we decline to reconsider that argument here.

Finally, the defendant argues that the Illinois death penalty statute is unconstitutional because, in his view, it has been construed as prohibiting the sentencing authority from considering sympathy for a capital defendant in deciding whether to impose the death penalty. Our decisions on the appropriate role of sympathy in the capital sentencing determination (see, *e.g., People v. Morgan* (1986), 112 Ill. 2d 111, 145-46; *People v. Wright* (1985),

111 Ill. 2d 128, 163-68) are consistent with the principle that the sentencing authority should "ignore only the sort of sympathy that would be totally divorced from the evidence adduced during the penalty phase" (*California v. Brown* (1987), 479 U.S. 538, 540, 93 L. Ed. 2d 934, 939, 107 S. Ct. 837, 839 (approving for use in capital sentencing proceedings instruction directing jurors not to be swayed "by mere sentiment, conjecture, sympathy, passion, prejudice, public opinion or public feeling")). (See *People v. Orange* (1988), 121 Ill. 2d 364, 391; *People v. Crews* (1988), 122 Ill. 2d 266, 291-93; *People v. Erickson* (1987), 117 Ill. 2d 271, 303-04.) Moreover, there is no indication here that the trial judge did not consider all the evidence in sentencing the defendant to death.

### III

For the reasons stated, the defendant's convictions and death sentence are affirmed. The clerk of this court is directed to enter an order setting Tuesday, November 15, 1988, as the date on which the sentence of death, entered in the circuit court of Jefferson County, is to be carried out. The defendant shall be executed by lethal injection in the manner provided by section 119—5 of the Code of Criminal Procedure of 1963 (Ill. Rev. Stat. 1985, ch. 38, par. 119—5). The clerk of this court shall send a certified copy of the mandate in this case to the Director of Corrections, to the warden of Stateville Correctional Center, and to the warden of the institution where the defendant is confined.

*Judgment affirmed.*